IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 19, 2002

**STATE OF TENNESSEE v. MARY JEAN MAYRAND**

**Direct Appeal from the Circuit Court for Rhea County**
**No. 15467     J. Curtis Smith, Judge**

**No. E2001-01051-CCA-R3-CD**
**February 19, 2003**

A Rhea County jury convicted the Defendant of first offense DUI, and the trial court sentenced her to forty-eight hours' confinement. In this direct appeal, the Defendant argues (1) that insufficient evidence was presented to support her conviction; (2) that the trial court erred by denying her challenge to one of the jurors during voir dire; (3) that the trial court erred by denying her pre-trial motion to dismiss the indictments; (4) that the trial court erred by allowing the arresting officer to testify as to the contents of an alcoholic beverage; and (5) that her constitutional rights were violated when the State failed to provide her with a "legible" copy of a videotape taken of her at jail following her arrest. We conclude that sufficient evidence was presented to support the Defendant's conviction and that the trial court erred by allowing the arresting officer to testify as to the contents of an alcoholic beverage, but that the error was harmless. We further conclude that the Defendant has waived all other issues on appeal. We therefore affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and DAVID H. WELLES, J., joined.

Howard L. Upchurch, Pikeville, Tennessee, for the Appellant, Mary Jean Mayrand.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; James Michael Taylor, District Attorney General; and Will Dunn, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

In February 2000, the Rhea County Grand Jury indicted the Defendant, Mary Jean Mayrand, for driving under the influence (DUI), possession of a Schedule III controlled substance with intent to sell or deliver, possession of a legend drug without a prescription, and violation of the implied consent law. Following a trial, a Rhea County jury found the Defendant guilty of first offense DUI. The trial court sentenced the Defendant to forty-eight hours' confinement, prohibited her from

driving a motor vehicle in the State of Tennessee for one year, ordered her to perform one hundred hours of community service, and imposed a fine of $350. In this appeal as of right, the Defendant presents the following issues for our review: (1) whether sufficient evidence was presented to support the Defendant's conviction; (2) whether the trial court erred by denying the Defendant's challenge to one of the jurors during voir dire; (3) whether the trial court erred by denying the Defendant's pre-trial motion to dismiss the indictments; (4) whether the trial court erred by allowing the arresting officer to testify concerning the contents of an alcoholic drink; and (5) whether the Defendant's constitutional rights were violated when the State failed to provide the Defendant with a "legible" copy of a videotape taken of the Defendant at the Rhea County jail following her arrest.[1] Having reviewed the record, we affirm the judgment of the trial court.

At the Defendant's trial, conducted on January 10, 2001, the following evidence was presented: Eugene Edward Lewis, an employee of the Rhea County Ambulance Service, testified that during the early morning hours of July 10, 1999, he and his partner were driving in an ambulance to the Rhea Medical Center to pick up a patient. Lewis recalled that it was a clear night and that the roads were dry. He stated that while driving on Highway 27, he and his partner noticed a Ford Crown Victoria weaving from the left side to the right side of the road, crossing both the yellow line in the center of the road and the white lines on the sides of the road. He stated that drivers of oncoming vehicles were flashing their headlights at the car. Lewis reported that he and his partner followed the car for a few miles and decided to contact the police when the vehicle almost struck a guardrail. He stated that they continued driving behind the car until a Tennessee state trooper arrived. Lewis recalled that the trooper pulled between the car and the ambulance and followed the car for a couple of miles before activating his emergency lights. Lewis stated that he saw the Crown Victoria pull off to the side of the highway, but he and his partner did not stop.

Phillip Dunn testified that he had been employed by the Tennessee Highway Patrol since 1988 and stated that he had been a state trooper for ten years. He recalled that he was traveling northbound on Highway 27 in Rhea County during the early morning hours of July 10, 1999 when he heard over his police radio a conversation between an ambulance driver and Rhea County Central Dispatch about a possible drunk driver. Dunn stated that he responded to the call, passed the ambulance, and maneuvered his vehicle behind the vehicle that had been reported. He recalled that he followed the vehicle for some time and observed that it was "weaving from side to side." Dunn testified that he then activated his emergency lights, and the car pulled over into a parking lot. He stated that at the time he pulled the vehicle over, it was not raining, but it began to "mist or sprinkle" during the stop.

Dunn reported that he was not familiar with the driver of the car, but he recognized the passenger in the vehicle, whom he identified as "Mr. Denton." He testified that he asked the driver

---

[1] In her brief, the Defendant includes a sixth issue in her "STATEMENT OF THE ISSUES": whether the trial court erred by denying the Defendant's motion for new trial, in which the Defendant alleged that unlawful contact occurred between the jurors and witnesses for the State during her trial. However, the Defendant presents no argument whatsoever to support this issue, and therefore, the issue is waived. See Tenn. R. Crim. App. 10(b).

of the car, whom he identified as the Defendant, for her driver's license, and she retrieved it from the trunk of the vehicle. He noted an odor of alcohol about the driver and stated that she seemed "unsteady." Dunn stated that he asked the Defendant whether she had had anything to drink, and she initially responded that she had not. Dunn testified that the Defendant attributed the odor of alcohol to Denton and told him that she was driving due to Denton's inability to drive. Dunn stated that in response to questioning, the Defendant first told him that she had been on the road only about ten minutes, but later told him that she had come from Cotton-Eyed Joe's in Knoxville, stopping in Rockwood to drop off passengers. Dunn reported that the Defendant also eventually admitted that she had drunk two "Long Island Teas," which Dunn defined as "a mixture of lemon juice and five different liquors" in "half ounce quantities of each."

Dunn testified that after following the Defendant on the highway, he felt that she should not have been driving and that after talking with her, he determined that "she'd obviously been drinking." He stated that he therefore asked the Defendant to perform field sobriety tests. Dunn reported that he was trained to observe the test-taker's attention span during the instructional phase of the tests because "intoxicated persons have trouble concentrating on two things at the same time." He stated that he also was trained to notice whether the person was unsteady during the instructional phase and whether the person could readily understand the instructions. Dunn testified that he had to repeat the majority of his instructions to the Defendant, and he stated that she was attentive only "part of the time" during the instructional phase of the tests. In addition, Dunn stated that the Defendant began some of the tests before he was able to finish explaining the test instructions.

Dunn reported that he first asked the Defendant to perform the horizontal gaze nystagmus test, and then moved on to a test which required her to stand with her feet approximately shoulder-width apart, extend her arms, tilt her head back, and touch her nose with each of her index fingers. Dunn stated that the Defendant was able to touch her nose with both fingers, but reported that she was unsteady during the test. Dunn testified that he next asked the Defendant to perform the "walk-and-turn, which consists of walking heel to toe nine steps," counting each step aloud, and then walking nine steps back to return to starting position. He stated that he had to repeat his instructions to the Defendant for this test, and he reported that on her first attempt, the Defendant "basically just walked" and used her arms for balance. Finally, Dunn testified that he had the Defendant perform the one-legged stand. For this test, Dunn instructed the Defendant to stand with her arms to her sides, raise one leg in front of her, and count from 1,001 to 1,025 or until Dunn asked her to stop. Dunn stated that the Defendant told him that she simply could not perform this test. Dunn testified that at some point during the field sobriety tests, the Defendant told him that she had some back and hip problems. She also told him that she was taking "muscle relaxers" and showed him two different prescription medications, Soma and Lortab, also known as dihydrocodeine, a Schedule III narcotic.

Dunn stated that following the field sobriety tests, he placed the Defendant under arrest for DUI and read her her rights. He offered her a blood alcohol test and a breathalyzer test both at the scene and later upon her arrival at jail. Dunn testified that to the best of his recollection, the Defendant told him at the scene that she both would and would not take the test. He stated that she read the implied consent law and ultimately signed a form refusing to take the test.

Dunn reported that after arresting the Defendant, he turned his attention to Denton, the passenger in the vehicle that the Defendant had been driving. He stated that he explained to Denton what was happening and told him that he would also be arrested. Dunn testified that during his stop of the Defendant, other officers had arrived at the scene in response to the call from the ambulance. He recalled that Denton exited the vehicle several times during the field sobriety tests, and Dunn asked other officers at the scene to watch Denton so that Dunn could devote his attention to the Defendant. Dunn stated that he later arrested Denton and placed him in the back of the police vehicle with the Defendant. He recalled that a check of the license tag on the Crown Victoria revealed that the car belonged to Denton, and Denton asked Dunn to park the vehicle for him. Dunn testified that he removed Denton's cell phone from the vehicle, and another officer moved the car into a parking space and locked it.

Dunn reported that he then transported both the Defendant and Denton to jail. At the jail, he read a form to the Defendant which explained the implied consent law and the consequences of refusing a blood alcohol test. He stated that he read the form to her at 3:14 a.m., and the Defendant signed the form and checked a box on the form indicating her refusal to submit to a blood alcohol test. Dunn read the form to the jury, and the State entered into evidence a copy of the form.

Dunn testified that a videotape was made of the Defendant's arrest. He explained that a video camera was mounted inside his police vehicle and that he was equipped with a "body mic." The videotape was shown to the jury.

On cross-examination, Dunn testified that during the field sobriety tests, the Defendant told him that she was disabled. He stated that she also told him that she needed to urinate, and he recalled that at times, the Defendant was moving about as if she needed to use the restroom. In addition, Dunn admitted that under some circumstances, the movement of other individuals during field sobriety tests, such as Denton getting in and out of his vehicle, could have an adverse effect on the person taking the tests.

Jeff Hill testified that he had been a patrolman for the Dayton Police Department for eleven years. He stated that on July 10, 1999, while he was on patrol, he heard on his police radio that Trooper Dunn had stopped a vehicle on Highway 27, and he drove to the scene to "back [Dunn] up." Hill recalled that when he arrived at the scene, Dunn was talking to the Defendant, whom Hill knew. He stated that immediately after his arrival, Denton, whom Hill also knew, got out of his car and walked towards Hill while Trooper Dunn repeatedly told him to get back into his vehicle. He testified that Denton eventually complied. Hill stated that he recalled hearing the Defendant say that she had drunk two Long Island Teas and that she had taken a muscle relaxer and a pain pill. He reported that he had made several arrests for DUI and stated that the Defendant appeared to be "intoxicated or under the influence of some type of drug." Hill testified that as Dunn prepared to administer field sobriety tests, Denton got out of his car again, walked to them, was told to return to his car, and did. Hill stated that he went to Denton's car to ensure that Denton did not get out of car during the tests, and he stated that therefore did not actually witness the tests.

On cross-examination, Hill testified that he heard the Defendant complain of back and hip injuries. He stated that he thought that the Defendant's speech was slurred on the night of her arrest. He also testified that she appeared to be cooperative at the scene.

Following Hill's testimony, Trooper Dunn was recalled to the stand. He testified that although he followed the vehicle driven by the Defendant for some time, he did not activate his blue emergency lights until immediately before the Defendant pulled over. He stated that the video camera in his police vehicle was set up to begin recording when his emergency lights were activated. Dunn stated that he did not see a safe spot to pull the Defendant over before the spot he chose for the stop. Finally, Dunn testified that he turned off his camera about three times during the stop while he was conversing with Jeff Hill. He stated that although a general order from the Tennessee Department of Safety directed him to leave on his recording equipment once activated, he had not received any type of disciplinary action or reprimand from his supervisors based on his turning off his equipment, and no fault had been found regarding his actions.

Detective Chris Hall testified that he had been employed by the Rhea County Sheriff's Department for eight years. He stated that on July 10, 1999, he was working as a patrol sergeant shift supervisor. Hall recalled that he responded to a call broadcast on his radio regarding a traffic stop. He stated that the original call was made by a medic unit that was following a vehicle which was suspected to be driven by a drunk driver, and he later heard that Trooper Dunn had stopped the vehicle. Hall testified that he responded to the call as back-up.

Hall stated that when he arrived at the scene, he saw Trooper Dunn interviewing the Defendant outside of the vehicle that she had been driving, and he reported that it appeared that he had already given her field sobriety tests. Hall testified that he walked to them and stood nearby while Dunn was talking to the Defendant. He stated that the Defendant appeared to be intoxicated. He testified that after they finished speaking, Dunn placed the Defendant in his vehicle and offered her a blood test.

Valarie Bell Lavender, a corrections officer with the sheriff's department, testified that she was working as the booking officer at the jail on the night that the Defendant and Denton were arrested. She stated that the Defendant was "very intoxicated" and recalled that the Defendant had blood-shot eyes and smelled of alcohol. Lavender testified that the Defendant told her that Denton had asked her to drive him home because "he was not in any condition to" drive. According to Lavender, the Defendant also said that she should not have been driving because she had drunk too much. On cross-examination, Lavender testified that Denton and the Defendant were uncooperative at the jail, and she stated that the Defendant refused a breathalyzer test.

Deputy Matt Rose of the Rhea County Sheriff's Department testified that he was working in the jail on July 10, 1999. He stated that he booked Denton while Lavender booked the Defendant when they were brought in following their arrests. He recalled that the Defendant appeared to be intoxicated. He testified, "She was unsteady on her feet and she looked like she was in disarray. Her

eyes were real glassy and watery." He also testified that Denton "got real loud" and began making accusations about officers and problems at the jail.

The Defendant testified that she was fifty-seven years old and reported that she was disabled. She stated that she was not employed, but received disability benefits from the government. The Defendant stated that she had been diagnosed with spondylolitis and spondylolitos, which she defined as "a separation of the spine in the lower back." She testified that these conditions caused her "excruciating pain" and reported that she was involved in an automobile accident in the 1970s that contributed to these conditions. She testified that at the time of her arrest, she was being treated by a doctor in Chattanooga and a doctor at "Johnson's Mental Health." She also stated that at the time of her arrest, she was taking Hydrocodone every eight hours, Lortab every twelve hours, and a generic brand of Soma every twelve hours. She testified that she was stopped by Trooper Dunn between 2:00 and 2:30 a.m., and she stated that she had last taken her medication at approximately 4:00 p.m. the prior afternoon.

The Defendant testified that on the day prior to her arrest, she had driven to Rockwood to meet with her daughter-in-law. She explained that her daughter-in-law's mother had passed away, and her daughter-in-law wished to sort through some of her mother's personal belongings. The Defendant testified that she left her home in Dayton and rode with Roy Denton, who was driving his car, to Rockwood in Roane County at approximately 4:30 p.m., shortly after taking her medication. She denied drinking any alcohol before leaving her home.

The Defendant reported that after arriving in Rockwood, she and Denton went to the home of her daughter-in-law's brother. She admitted that while there, she drank a "Long Island Tea." However, she described the drink as a wine cooler and maintained, "To me that's Long Island Tea." She denied knowing of any other drink by the same name. The Defendant stated that she sipped the wine cooler slowly at approximately 6:00 or 6:30 p.m. She reported that they stayed in Rockwood for approximately an hour, and then she drove to Kingston. She stated that a total of five people went with her: her son, her daughter-in-law, her daughter-in-law's brother, his girlfriend and his sister-in-law at the time. She stated that four of these people rode with her in her car. The Defendant testified that she went to Kingston to lend "moral support" to her daughter-in-law as she sorted through her mother's personal effects. She recalled that they left Kingston around 10:00 or 10:30 p.m. The Defendant denied drinking any alcohol while in Kingston.

The Defendant stated that after leaving Kingston, she returned to Rockwood, where she drank a second twelve-ounce wine cooler at approximately 10:00 or 10:30 p.m. She maintained that she was not intoxicated after drinking the two wine coolers, and she insisted that the pills that she took at 4:00 p.m. did not have an effect on her. The Defendant also denied going to Cotton-Eyed Joe's on the night of her arrest and explained that she was "scared and got [her] tongue all tied in knots" while speaking to Trooper Dunn about who had been to the club. She stated that although she and the group of people with her earlier that evening had "discussed it," only her daughter-in-law's brother and his girlfriend actually went to the club. She stated that they drove to Cotton-Eyed Joe's in a separate car and later returned the car to the home where family members were sorting through

the mother's personal effects. The Defendant reported that she drove the pair from Kingston to Rockwood after they returned from the club.

The Defendant reported that after returning to Rockwood, she and Denton left for Dayton between 12:30 p.m. and 1:00 a.m. She recalled that it had been raining all evening around Kingston and Rockwood, and she maintained that it was raining when they left Rockwood. The Defendant testified that she drove home because she thought Denton had "had too much to drink," and she "didn't think he should" drive. She also stated that Denton "gets very argumentative" and makes her nervous when he drinks.

The Defendant testified that the roads were wet as she drove home to Dayton and stated that there were puddles of water and portions of tires on the highway. She stated, "I swerved to dodge them, because I was not . . . use[d] to that car and it had been wrecked previously, and had a lot of front end damage to it . . . ." In addition, she maintained that she had difficulty seeing because of the rain, because it was night, and because she wore contacts. The Defendant recalled seeing bright lights behind her, but stated that she could not distinguish whether the vehicle following her was "an ambulance or a pickup truck." She reported that she also recalled seeing Trooper Dunn's emergency lights, and she stated that when she saw them, she immediately pulled off the road.

The Defendant testified that when Dunn approached her vehicle, she partially opened her window, he asked her about her driver's license, and he then spoke to Denton, who had just awoken in the passenger seat. The Defendant reported that she told Dunn that her license was in the trunk and emerged from her vehicle to retrieve it. She explained that she felt stiff because she had been sitting for a long period of time and because she had been "tensed up" due to the rain. She testified that she thus felt "weak legged" when she got out of the car. When asked whether she staggered when she walked to the trunk of her vehicle, she stated, "I wouldn't know if I wobbled or not."

With regard to the field sobriety tests, the Defendant maintained that she was "in pain" during the tests. She testified that she told Dunn each time he asked her to perform a test that "there was no humanly way possible [she] could do it," but she could not recall whether she actually told Dunn that she was in pain during the tests. She stated that she was able to understand Trooper Dunn and had no trouble touching her nose with her fingers. She also reported that she "joked" with Dunn by making "a few remarks to him about his southern accent." However, the Defendant maintained that she was "scared to death" and distracted by Denton's behavior and "attitude" during the tests. She testified that Denton's behavior "bothered [her] a lot" and stated, "I didn't know what to expect. I couldn't control it." She also testified that she was embarrassed and nervous because of the other officers watching her attempt to perform the tests. Finally, she claimed that her contacts were "bothering" her and that she needed to urinate. She reported that she told Dunn numerous times that she needed to use the restroom, and she explained that she was rocking on the balls of her feet at the scene because of this.

The Defendant stated that she remembered Lavender at the jail. She testified that while she was at the jail, she tried to "[g]et [Denton] to settle down and be quiet." She stated that he was loud

and argumentative, and she wanted him to cooperate with the officers. The Defendant explained that her efforts to calm Denton may have distracted her from the booking officers. She testified that she nonetheless understood what was happening and maintained that she tried to cooperate.

On cross-examination, the Defendant admitted that she may have crossed the center line on the highway when she was "dodging some of the larger water spots." However, she maintained that she did not veer off the road. She also testified that she had been taking her pain medications for years and admitted that she had noticed that at least one of her prescriptions prohibited her from driving after taking her pills. In addition, she admitted that she understood that she was not to mix her medications with alcohol, but she stated, "That's why . . . I just didn't do it. I waited several hours." The Defendant testified that she had a cane to help her walk, which she claimed was in the back seat of the car she was driving at the time of her arrest. She reported that she informed Dunn that she was "handicapped and . . . had a disability." She maintained that Dunn knew her cane was in the vehicle because he looked inside the car, but she stated that she did not actually tell him that she had a cane. The Defendant admitted that she told Dunn that she had been driving for only ten minutes at the time of the stop and that she had not had anything to drink. She also testified that when Dunn asked her to perform the walk-and-turn test, he told her to take nine steps, and she said "four." She explained, "I'd heard lots of the county officers . . . talk about giving field sobriety tests and them laughing about they would only demonstrate four, because after that they would stagger themselves, so that's what I was referring to." She maintained that she laughed with Dunn about this and about his pronunciation of a word, despite the gravity of the circumstances, but she explained that she was "just scared and nervous."

Following the Defendant's testimony, Trooper Dunn was recalled to the stand. He testified that he searched Denton's vehicle at the time of the stop, but did not find a cane or a walker in the car. He also stated that he had created a written inventory of the items in the vehicle. Following Dunn's testimony, Chris Hall was recalled to the stand. He stated that it was not raining when he arrived at the scene on the night of the Defendant's arrest, but he stated that it may have "sprinkled." Eugene Edward Lewis was next recalled to the stand. He testified that it was not raining when he saw the Defendant's vehicle weaving across the highway. He also maintained that he did not see standing water in the road and that water was not a factor with regard to the Defendant's driving.

## I. SUFFICIENCY OF THE EVIDENCE

The Defendant first argues that the evidence presented at her trial was insufficient to support her conviction. Specifically, she contends that the State failed to establish beyond a reasonable doubt that she was under the influence of an intoxicant to such a degree that her ability to operate a motor vehicle was impaired. The statute governing the offense of which the Defendant was convicted provides, in pertinent part, as follows:

> It is unlawful for any person to drive or to be in physical control of any automobile or other motor driven vehicle on any of the public roads and highways of the state, or on any streets or alleys, or while on the premises of any shopping

center, trailer park or any apartment house complex, or any other premises which is generally frequented by the public at large, while:

> . . . [u]nder the influence of any intoxicant, marijuana, narcotic drug, or drug producing stimulating effects on the central nervous system . . . .

Tenn. Code Ann. § 55-10-401(a)(1).

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

Having thoroughly reviewed the record, we conclude that sufficient evidence was presented to support the Defendant's conviction. The driver of an ambulance and the arresting officer both testified that they observed the car driven by the Defendant weaving across the highway. Although the Defendant attributed this to standing water and debris on the highway, all others who testified concerning the weather and the condition of the road reported that it was not raining when the Defendant was observed weaving across the road, and no one except the Defendant recalled seeing any obstacles in the road which would have forced the Defendant to weave.

More importantly, the arresting officer, two other officers present at the scene of the Defendant's arrest, and two booking officers at the jail testified that the Defendant appeared to be intoxicated or at least under the influence of some type of drug. Although the Defendant reported both at trial and at the scene of her arrest that she was disabled, the arresting officer's conclusion that she was intoxicated on the night of her arrest was not based merely on the field sobriety tests which she failed, but also on other factors, such as her behavior, the odor of alcohol emanating from the Defendant's person, and admissions by the Defendant at the scene. According to the arresting officer,

the Defendant admitted to having taken two prescription medications, one of which was classified as a Schedule III narcotic, and to having drunk two alcoholic beverages. At trial, the Defendant did not deny that she had drunk two alcoholic beverages, although she claimed that the drinks she consumed did not contain hard liquor, and she also stated that she took two prescription medications approximately three hours before driving, despite directions on her prescription labels which warned her not to operate a vehicle after taking the medications. This is clearly sufficient evidence to support the jury's finding that the Defendant operated a motor vehicle while under the influence. This issue is without merit.

## II. VOIR DIRE

The Defendant next argues that the trial court erred by failing to remove for cause one of the jurors who sat for her case. However, the Defendant has failed to include a transcript of voir dire in the record on appeal. It is the duty of the accused to provide a record which conveys a fair, accurate and complete account of what transpired with regard to the issues which form the basis of the appeal. Tenn. R. App. P. 24(b); see State v. Taylor, 992 S.W.2d 941, 944 (Tenn. 1999). Because a transcript of voir dire is not included in the record, the Defendant has waived this issue on appeal. See Tenn. R. Crim. App. 10(b); Thompson v. State, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997). In the absence of an adequate record, we must conclusively presume that the determinations made by the trial court were correct. State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991).

## III. DEFENDANT'S MOTION TO DISMISS THE INDICTMENTS

The Defendant contends that the trial court erred when it denied her motion to dismiss the indictments in this case. The Defendant argues that the State's prosecution of her pursuant to the indictments resulted in violations of her right against double jeopardy, her due process rights, and the excessive bail provisions of the United States and Tennessee Constitutions. These arguments were included in her motion to dismiss the indictments, and a written order is included in the technical record in which the trial court denied the motion. Other than the motion and the order, no evidence is included in the record concerning this issue.

It is the duty of the appellant to prepare a record which conveys a fair, accurate, and complete account of what transcribed in the trial court with respect to the issues which form the basis of the appeal. Tenn. R. App. P. 24(b); see Taylor, 992 S.W.2d at 944. In the absence of an adequate record on appeal, we must presume that the trial court's rulings were supported by sufficient evidence. Oody, 823 S.W.2d at 559. There is no evidence in the record demonstrating that the trial court's ruling with regard to this issue was in any way incorrect, and without further evidence in the record concerning this issue, we are precluded from properly reviewing it.

## IV. TESTIMONY BY TROOPER DUNN

The Defendant next argues that the trial court erred by allowing Trooper Dunn, the arresting officer in this case, to testify concerning the contents of an alcoholic beverage, specifically a Long Island Tea. During direct examination of Dunn, the following colloquy occurred:

[STATE]: . . . . Did [the Defendant] ever describe to you what kind of alcohol she had ingested, please?

[DUNN]: Yes, sir, she stated she had drank two Long Island Teas.

[STATE]: Okay. Now, is that an alcoholic beverage?

[DUNN]: Yes, sir, it is.

[STATE]: And she stated she had two of those?

[DUNN]: Yes, sir.

[STATE]: Can you tell the ladies and gentlemen what's in a Long Island Tea, please, sir?

[DUNN]: Yes, sir.

[DEFENSE COUNSEL]: Judge, I object if he's reading some document. . . . He's pulled out a document to read from. That would be hearsay.

THE COURT: I sustain the objection.

[STATE]: From your memory could you tell us what's in a Long Island Tea, please sir?

[DUNN]: Sure. There's –

[DEFENSE COUNSEL]: I object.

THE COURT: Overruled.

[STATE]: Go ahead.

[DUNN]: . . . [I]t's a mixture of lemon juice and five different liquors. It's, I believe, half ounce quantities of each. There'd be roughly two and a half ounces of the liquor.

[STATE]: Okay, what kind of liquor are we talking about? Liqueurs or hard liquor?

[DUNN]: Hard liquor, as I would call it, and I can't quote you the exact brands without looking at the document.

In a bench conference held out of the hearing of the jury after this exchange, the State informed the court: "This officer is familiar with the drink Long Island Tea, but he got the ingredients specifically out of a bartender's guide." The court responded that it agreed with defense counsel that information from the bartender's guide would constitute hearsay, but that it had allowed the witness to testify from his own knowledge.

We must first consider whether testimony concerning the contents of an alcoholic beverage is the subject of expert testimony or lay opinion. The admission of expert testimony is governed by Tennessee Rule of Evidence 702, which states, "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Evidence constitutes "scientific, technical or other specialized knowledge," Tenn. R. Evid. 702, if "it concerns a matter that 'the average juror would not know, as a matter of course . . . .'" State v. Murphy, 953 S.W.2d 200, 203 (Tenn. 1997) (quoting State v. Bolin, 922 S.W.2d 870, 874 (Tenn. 1996)). Expert testimony is "predicated upon specialized knowledge that is unfamiliar to most lay-persons." State v. Galgalo B. Halake, No.

-11-

M2000-00146-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 921, at *21 (Tenn. Crim. App., Nashville, Nov. 29, 2001). Because testimony concerning the contents of an alcoholic beverage is not "predicated upon specialized knowledge that is unfamiliar to most lay-persons," id., we conclude that the testimony in this case does not qualify as expert testimony.

Both the State and the Defendant analyze this issue under Tennessee Rule of Evidence 701, which allows for opinion testimony by lay witnesses. Rule 701 provides, in pertinent part:

> If a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to the opinions or inferences which are
>
> > (1) rationally based on the perception of the witness and
> > (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

Tenn. R. Evid. 701(a). "Rule 701(a) provides that opinion testimony by lay witnesses is limited to opinions not requiring special knowledge; situations where the witness cannot readily communicate without testifying in terms of opinions; and situations where the opinion will not mislead the trier of fact to the prejudice of the objecting party." State v. Dutton, 896 S.W.2d 114, 118 n.2 (Tenn. 1995). Although we note that Trooper Dunn was a lay witness, we are unconvinced that his testimony concerning the contents of a Long Island Tea constitutes opinion testimony. The Advisory Commission Comments to Rule 701 provide: "In situations were a witness 'cannot readily and with equal accuracy and adequacy' testify without an opinion, the witness may state opinions requiring no expertise. Consequently, a lay witness may testify that a person was 'drunk' or that a car was traveling 'fast.'" Because Trooper Dunn's comments were factual in nature, we conclude that his testimony did not qualify as opinion testimony by a lay witness.

We instead find Tennessee Rule of Evidence 602 to be more applicable to the issue at hand. Rule 602 provides, in pertinent part, as follows: "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness's own testimony." In this case, no foundation was laid for Trooper Dunn's testimony, and we thus conclude that insufficient evidence was presented to support a finding that Trooper Dunn had personal knowledge about the contents of a Long Island Tea. In fact, Trooper Dunn conceded that he was utilizing a "document," apparently a bartender's guide, when he testified as to the contents of the drink. Perhaps more importantly, Trooper Dunn did not have personal knowledge of the contents of the alcoholic beverages consumed by the Defendant on the night prior to her arrest. Because there was no indication that Dunn had personal knowledge to support his testimony, we conclude that Dunn should not have been allowed to testify concerning the contents of the beverage.

However, the error does not "affirmatively appear to have affected the result of the trial on the merits." Tenn. R. Crim. P. 52(a). Furthermore, in light of the substantial evidence presented at trial supporting the Defendant's conviction, it does not appear that the error "more probably than not" affected the judgment. Tenn. R. App. P. 36(b). We therefore conclude that the trial court's error concerning Dunn's testimony was harmless.

## V. VIDEOTAPE

Finally, the Defendant contends that the State's failure to provide the defense with a "legible copy" of a videotape of the Defendant made at the jail on the night of her arrest resulted in a violation of the Defendant's due process rights and her right to a fair trial. She argues that the videotape constitutes exculpatory evidence and "is tantamount to lost or destroyed evidence." She admits that a copy of the tape was provided to the defense prior to trial, but states that the tape could not be viewed because it "was made on a machine which records long periods of time, and the tape is not legible when used with a regular VCR or VCR's available to the public."

The Defendant has failed to include a copy of the tape in the record on appeal. As we have previously stated, it is the duty of the accused to provide a record which conveys a fair, accurate and complete account of what transpired with regard to the issues which form the basis of the appeal. Tenn. R. App. P. 24(b); see Taylor, 992 S.W.2d at 944. "Absent the necessary relevant material in the record an appellate court cannot consider the merits of an issue." State v. Ballard, 855 S.W.2d 557, 560-61 (Tenn. 1993). The Defendant's failure to include a copy of the videotape in the record renders us unable to properly review this issue. We therefore conclude that this issue is waived.

Accordingly, the judgment of the trial court is AFFIRMED.

 

_____
ROBERT W. WEDEMEYER, JUDGE

-13-