**STATE of Tennessee, Appellee,**

v.

**Darel G. BOLIN, Appellant.**

Supreme Court of Tennessee,
at Knoxville.

May 13, 1996.

Joe L. Finley, Jr., Assistant Public Defender, Cookeville, for Appellant.

Charles W. Burson, Attorney General & Reporter, Michael E. Moore, Solicitor General, Gordon W. Smith, Associate Solicitor General, Nashville, William E. Gibson, District Attorney General and David A. Patterson, Assistant District Attorney General, Cookeville, for Appellee.

## OPINION

DROWOTA, Justice.

The defendant, Darel G. Bolin, appeals from the Court of Criminal Appeals' affirmance of his conviction for the aggravated sexual battery of a nine year old girl. This case presents two issues for our determination: (1) whether the admission at trial of a social worker's testimony, which consisted of a general statement that young victims of repeated sexual abuse have trouble remembering when the specific events of abuse occurred, constitutes reversible error; and (2) whether the verdict was an impermissible "patchwork" because the evidence did not support the jury's finding of aggravated sex-

ual battery. For the reasons set forth below, we conclude that no reversible error occurred, and therefore, we affirm the judgment of the Court of Criminal Appeals.

## FACTS AND PROCEDURAL HISTORY

In March 1992 K.N., the nine-year old daughter of the defendant's live-in girlfriend, wrote a note to her teacher in which she stated that "my dad likes me in the wrong way, he touches my middle part." The teacher then informed the Department of Human Services (DHS), who conducted a series of interviews in which K.N. related the details of the events. As a result of these interviews, in May 1992 the Cumberland County Grand Jury indicted the defendant for the aggravated rape of K.N. The indictment stated that this offense occurred "on several occasions during the past three (3) years."

At trial K.N. testified that on numerous occasions the defendant went into the bathroom with her, required her to hold Playboy magazines in front of her face, and "made me put my hand on his thing and made me go up and down, and sometimes he made me put my mouth on it." K.N. stated that on one particular occasion she was required to perform fellatio on the defendant, and that she spat the "icky stuff" that came out of his penis into the sink. K.N. also stated that the defendant sometimes cornered her in a bedroom and tried to put his penis inside her, but that she "scooted away" from him. K.N. testified that the defendant threatened to kill her, her mother and her twelve year old brother Chad if she told anyone of their activities. K.N. could not say exactly when the sexual events occurred, but stated that they happened when she was probably "going on nine." On cross-examination K.N. admitted that she and Chad had told their mother in the summer of 1992 that the events did not occur. K.N. also testified that she and Chad had made these untrue statements in order to protect their mother.

The State also called Chad as a witness. Chad stated that on one occasion he observed

the defendant and K.N. in the bedroom, that their pants were down, and that the defendant was holding K.N.'s wrists and trying to put his penis inside her. Chad testified that he did not tell anyone about this because "I'd be put in foster care, Darel would be put in jail, and mama would be all upset and everything." Chad also admitted that, in the late spring or summer of 1992, he had told his mother that nothing had occurred between the defendant and K.N. However, he also explained that he told his mother this so as not to upset her.

The State's final witness was K.N.'s mother. She testified that the defendant lived with her and the children intermittently since 1987, and full-time from August 1991 to March 1992. The mother stated that she and the defendant had planned to get married in April of 1992. She also testified she knew nothing of any improper contact between K.N. and the defendant, and that the only incident between them having any connection to sex occurred in February 1992 when the defendant informed the mother that K.N. had walked in on him while he was masturbating in the bathroom. The mother stated that at no time did K.N. ever tell her that the defendant had done anything to her.

The defense called as its first witness Dr. William Colburn. Dr. Colburn testified that there was no clear medical evidence that K.N. had been abused. However, Dr. Colburn also stated that K.N. told him that the defendant had attempted to place his penis inside her several times, but that she had always eluded him. Dr. Colburn also testified that K.N. had told him that she had never been abused by anyone other than the defendant.

The defense next called Dr. Mary Sentef, a pediatrician who testified that in January 1988 K.N. reported being sexually abused by her babysitter's eleven year old son. Dr. Sentef testified that she examined K.N., concluded that sexual abuse had possibly occurred, and then contacted DHS.

The defendant then took the stand. He denied having any improper contact with K.N., although he did mention the bathroom incident testified to by the mother. The defendant testified that K.N. and her brother disliked him and were jealous of his relationship with the mother; the defendant also hypothesized that K.N. fabricated the charges against him so as to get rid of him and thwart the impending marriage between him and their mother.

The final witness called by the defense was Dorothy Terwilliger, a social worker employed by DHS. Terwilliger testified that she interviewed K.N. on March 31, 1992—soon after K.N. wrote the note to the teacher—and that K.N. told her that the defendant had held her wrists and tried to place his penis inside her. Terwilliger testified that K.N. did not mention that she had ever been made to perform oral sex on the defendant during the first interview session; she testified that these details had surfaced in later interviews. Terwilliger also stated that K.N. could not specify when the abuse occurred: K.N. first said in the interview that the abuse occurred "about five years ago," but after further questioning, she said that it occurred "about two years ago." On the State's cross-examination of Terwilliger, the following colloquy took place:

Q: Has K.N. ever made a statement, to your knowledge, that's inconsistent with her original statement? I know there's been more detail that's come out across the course of this investigation. Do you know of any inconsistency?

A: I would say that the time frames with [K.N.] may be inconsistent. And if you're abused over a long period of time ... (interrupted)

Defense Counsel: I'm going to object, your honor, to all these interpretations on how to tell what the truth is. That's the jury's job.

The Court: Well, she may answer the question. Overruled.

Defense counsel: But she didn't answer the question. The question was, did she make inconsistent statements, not a psychological opinion.

The Court: You may answer the question.

A: *Children that are abused over a long period of time or are abused on multiple occasions have a difficult time remembering when, where and how each event takes place. It's hard to get a child to remember what they had for supper last night sometimes. The child who is traumatized certainly can't remember what, when and how on specific dates. We try to get them to focus on what grade they may have been in school at the time, was it cold or warm outside, was it around Christmas time, or try to pin them down, but it's just about impossible.*

(emphasis added.)

At the conclusion of the proof, the State elected to proceed on the incident where the defendant allegedly forced K.N. to perform fellatio upon him in the bathroom. The jury found the defendant guilty of aggravated sexual battery. Tenn.Code Ann. § 39–13–504(a). The defendant then appealed from this judgment to the Court of Criminal Appeals, and that court affirmed the judgment. We granted the defendant's application for permission to appeal pursuant to Rule 11, Tenn.R.App.P., to address whether the trial court erred in admitting the emphasized testimony of the social worker, and whether the error, if any, requires reversal of the conviction.

## I.

The first issue we address is whether the admission of the testimony was erroneous. In *State v. Ballard*, 855 S.W.2d 557 (Tenn.1993), we held that the admission of expert testimony as to the "child sexual abuse syndrome"—a constellation of symptoms supposedly exhibited by young victims of sexual abuse [1]—was error. We stated that:

Research has led us to conclude that no one symptom or group of symptoms are readily agreed upon in the medical field

that would provide a reliable indication of the presence of sexual abuse. A behavioral profile that is sufficient for the purposes of psychological treatment between patient and doctor does not rise to the strict requirements necessary for admissibility in a criminal court of law. A dysfunctional behavioral profile may be brought on by any number of stressful experiences, albeit, including sexual abuse. However, the list of symptoms described by [the expert in this case] are too generic. The same symptoms may be exhibited by many children who are merely distressed by the turbulence of growing up.

Further, because no consensus exists on the reliability of a psychological profile to determine abuse, expert testimony describing the behavior of an allegedly sexually abused child is not reliable enough to 'substantially assist' a jury in an inquiry of whether the crime of child sexual abuse has taken place.

*Ballard*, 855 S.W.2d at 562 (citation omitted.) After setting forth our objections, we concluded that "expert testimony of this type invades the province of the jury to decide on the credibility of witnesses." *Id. See also State v. Anderson*, 880 S.W.2d 720 (Tenn. Crim.App.1994); *State v. Schimpf*, 782 S.W.2d 186 (Tenn.Crim.App.1989).

The defendant argues that the emphasized testimony of the social worker is akin to expert testimony of the "child sexual abuse syndrome." Therefore, he contends, its admission was error.

On the other hand, the State points out that the social worker was not qualified as an expert. Thus, it argues, the testimony was not expert testimony at all, and it does not violate *Ballard*. Moreover, the State argues that the testimony was not even "opinion" evidence, either expert or lay, because it was based upon her personal, factual observation of children as a Department of Human services counselor. Therefore, the State concludes, the testimony was consistent with the

---

1. The specific symptoms identified by the expert in *Ballard* were bed-wetting, clinging, fear, irrita-

bility, nightmares, anxiety and discipline problems at school.

rule that an "ordinary witness must confine his testimony to a narration of facts based on first-hand knowledge and avoid stating mere personal opinion." *Blackburn v. Murphy,* 737 S.W.2d 529, 531 (Tenn.1987), quoting D. Paine, *Law of Evidence* (1974), § 168, p. 186.

We cannot agree with the State's argument. Taking the latter point first, we note that although the social worker's testimony may have been based on factual observations, it was not presented that way: the testimony contains no references to any such observations, and was stated in a general and abstract manner. Therefore, it must be classified as "opinion" evidence. Moreover, even if the testimony was not "opinion" evidence, this does not mean that it is not "expert" evidence. Rule 702 of the Tennessee Rules of Evidence provides that:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify *in the form of an opinion or otherwise.*

(emphasis added.)

Not only does the rule governing expert testimony not require it to be given in the form of an opinion, the Court of Appeals has held that expert testimony does not have to be so presented. *Pichon ex rel. Pichon v. Opryland USA, Inc.,* 841 S.W.2d 326 (Tenn.App. 1992).

As to the State's first point, it is true that the social worker was not formally qualified as an expert. However, it is also true that the average juror would not know, as a matter of course, that abused children often confuse or forget the specific dates of the abuse. Therefore, the testimony was clearly "specialized knowledge" intended to "substantially assist the trier of fact to understand the evidence or to determine a fact in issue," Tenn.R.Evid. 702. Thus, it constitutes expert proof. Because the social worker's testimony is closely related to the child sexual abuse syndrome—indeed, it is but a

specific symptom in the "constellation"—we conclude that it violates the rule enunciated in *Ballard* and that its admission was error.

Having determined that the admission of the testimony was error, we now move to the next inquiry: whether the error was prejudicial to the defendant. An error is prejudicial, and thus not harmless, if, after considering the whole record, it involves a substantial right which more probably than not affected the judgment, or results in prejudice to the judicial process. Tenn.R.App.P. 36(b).

The defendant argues that the testimony was not harmless because it effectively "explained away" the inconsistencies of K.N. and Chad's testimony and their recantations of the accusations. This, the defendant insists, coupled with the lack of medical proof of abuse, renders the erroneously admitted testimony prejudicial to the defendant.

We find, however, that the defendant construes the social worker's testimony too broadly. The testimony essentially consists of an explanation of a narrow issue—why K.N. could not assign reasonably specific time or dates to any of the alleged events of sexual abuse. Therefore, the testimony does not, unlike the testimony in *Ballard,* purport to completely vouch for the overall credibility of the victim, and thus it cannot be said to have "explained away" the inconsistencies and recantations—the heart of the defense theory. Hence, the damaging effect of the testimony is minimal.

Moreover, the likelihood that the error could have affected the judgment is slight in view of the entire record. While there was no conclusive medical evidence that K.N. had been abused, neither did the medical evidence rule out the possibility of abuse. K.N. related episodes of sexual abuse to three different parties—the teacher, the social worker, and Dr. Colburn—over a period of several weeks or months. Furthermore, her older brother witnessed improper sexual contact occurring between the defendant and K.N. Aside from the recantation—for which a reasonable explanation was offered—the only possible inconsistencies in K.N.'s stories

that we can glean from the record are that she did not mention any oral sex during the first interviews, but revealed this information at a later time; and that she told Dr. Colburn that she had not been abused when in fact she had possibly been abused some years ago by an eleven year old boy. In summation, the evidence of the defendant's guilt is strong; this is not a case where the only evidence of the defendant's guilt is the unsubstantiated testimony of the alleged victim.[2]

After considering the entire record, we are satisfied that this error did not affect the judgment; and we are convinced that it did not result in prejudice to the judicial system as a whole.

## II.

The next issue that we address is whether the jury's finding of aggravated sexual battery constituted an impermissible "patchwork" verdict of the type condemned in *State v. Shelton,* 851 S.W.2d 134 (Tenn.1993). The defendant argues that the verdict is impermissible because the evidence supporting the incident upon which the State elected to proceed—the fellatio incident—shows "sexual penetration," an element of aggravated rape,[3] and not "sexual contact," an element of aggravated sexual battery.[4] Because the evidence supporting the incident does not fit the crime of aggravated sexual battery, the defendant argues, the jury must have based its verdict on incidents other than the one elected by the State.

**2.** In the Court of Criminal Appeals, Judges Wade and Hayes found that the admission of the social worker's testimony was error, but determined that it was harmless in light of the amount of evidence of the defendant's guilt in the record.

**3.** Aggravated rape is defined in Tenn.Code Ann. § 39–13–502(a) as the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim ...". "Sexual penetration" is defined in Tenn.Code Ann. § 39–13–501(7) as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other per-

■ The defendant's argument is without merit. First, the evidence in the record shows that the defendant forced K.N. to perform fellatio in the bathroom in addition to masturbating him. Because the jury is free to believe only part of a witness' testimony, *Wilson v. State,* 574 S.W.2d 52, 55 (Tenn.Crim.App.1978); *Batey v. State,* 527 S.W.2d 148, 150 (Tenn.Crim.App.1975), the jury may have simply believed K.N.'s testimony about the masturbation but disbelieved her allegations of oral sex. Such a finding would constitute the element of "unlawful sexual contact" required for the crime of aggravated sexual battery. Second, the trial court instructed the jury that aggravated sexual battery was a lesser included offense of aggravated rape. It is well-settled that when a jury is instructed as to a lesser included offense of that charged in the indictment, a conviction of the lesser included offense may stand, even if the technical requirements of that offense are not present, if the evidence supports the greater offense. *State v. Mellons,* 557 S.W.2d 497, 499 (Tenn. 1977); *Reagan v. State,* 155 Tenn. 397, 293 S.W. 755 (1927); *Craig v. State,* 524 S.W.2d 504, 506 (Tenn.Crim.App.1974). Because we conclude that the evidence supports a finding of aggravated rape, the jury's verdict of aggravated sexual battery may stand.

Because we conclude that there is no prejudicial error in this record, the judgment of the Court of Criminal Appeals is hereby affirmed.

ANDERSON, C.J., and BIRCH, J., concur.

REID and WHITE, JJ., Dissent.

son's body, but the emission of semen is not required."

**4.** Aggravated sexual battery is defined in Tenn. Code Ann. § 39–13–504(a) as "unlawful sexual contact with a victim by the defendant or the defendant by the victim ...". "Sexual contact" is defined in Tenn.Code Ann. § 39–13–501(6) as "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification."

WHITE, Justice, dissenting.

I dissent from the majority's holding that the admission of the social worker's testimony "probably did not affect the judgment ... and ... did not result in prejudice to the justice system as a whole." In my opinion the conclusion is fostered, not by a legal analysis of the effect of the clearly inadmissible testimony, but by the justified disgust over defendant's despicable offense.

The victim and her brother testified to acts which could constitute the offense of aggravated sexual battery.[1] They both admitted that they had told their mother, when she asked them to tell her the truth, that the events did not occur. Numerous other inconsistencies were developed in cross-examination of the victim, her brother, and her mother.

Defendant testified and denied the accusations. He presented evidence that the victim had reported prior sexual abuse by her babysitter's son. Defendant also called a social worker and two doctors who described other details inconsistent with the victim's testimony.

Thus, as in most cases of this nature, the jury's task was to determine whether to believe the victim or the defendant. The victim's prior inconsistent statement and the numerous inconsistencies in the details of the offense, according to the jury instructions given by the trial judge, require the jury to weigh the evidence and entitle the jury to disregard the evidence and treat it as untrue, if it is not independently corroborated. *See State v. Matthews*, 888 S.W.2d 446, 449 (Tenn.Crim.App.), *perm. to appeal denied*, (Tenn.1993).

This task of weighing conflicting evidence and ascertaining which evidence to accept is the jury's function. It is, in essence, the reason the jury system exists. *See e.g., State v. Anderson*, 880 S.W.2d 720, 726 (Tenn. Crim.App.), *perm. to appeal denied*, (Tenn. 1994); *State v. Shropshire*, 874 S.W.2d 634, 639 (Tenn.Crim.App.1993), *perm. to appeal denied*, (Tenn.1994); *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn.Crim.App.), *cert. denied*, (Tenn.1978). Appellate courts often caution trial judges against invading that sacred province. *See e.g., Morgan v. Tennessee Central Ry. Co.*, 216 S.W.2d 32, 37 (Tenn. 1948); *State v. Shropshire*, 874 S.W.2d 634, 639 (Tenn.Crim.App.1993), *perm. to appeal denied*, (Tenn.1994); *Lorentz v. Deardan*, 834 S.W.2d 316, 320 (Tenn.App.), *perm. to appeal denied*, (Tenn.1992). We strictly apply the rules of evidence to assure that credibility is attacked or bolstered only by appropriate, authorized means. *See e.g., State v. Dutton*, 896 S.W.2d 114, 118 (Tenn.1995); *State v. Morgan*, 541 S.W.2d 385 (Tenn.1976); *State v. Walton*, 673 S.W.2d 166, 169 (Tenn. Crim.App.), *perm. to appeal denied*, (Tenn. 1984).

Trial lawyers are taught that the hallmark of a good impeachment cross-examination are attacks on accuracy of observation, memory, and truthfulness. *See generally* G. Lilly, An Introduction to the Law of Evidence, § 79, at 279 (1978). A witness who is discredited by his or her own contradictions or faulty or insufficient recollection is not as believable as one who fares well under cross-examination. Our acceptance of this proposition is recognized in our rules of evidence and our case law and repeated in jury instructions. *See e.g.,* Tenn.R.Evid. 607–609; *Johnston v. Cincinnati N.O. & T.P. Ry. Co.*, 146 Tenn. 135, 240 S.W. 429, 436 (Tenn.1922); Tennessee Pattern Jury Inst. Civil 2.20. These universally recognized and justified rules are among those most-remembered and often-cited by law students, professors, and lawyers in the context of virtually every kind of legal dispute. Yet in the context of child witnesses and sexual offenses prosecutions these familiar rules are all too often brushed aside. The desire to purge society of pedophiles, to minimize the trauma experienced by innocent child victims, and to prosecute and punish harshly those who commit sexual abuse is understandable. But accomplishing

---

1. Since the state elected to proceed on the incident on the bathroom, in which defendant alleg-edly forced the victim to perform fellatio, the victim was actually the only witness.

those desirable goals by stretching evidentiary rules beyond recognition is neither justified nor acceptable.

In this case, and all too often in cases of this nature, an unqualified witness was allowed to tell the jury who to believe and why. The social worker's testimony discounted all the familiar facets of impeachment. First, she told the jury that recollection and memory, often a first-line attack in credibility skirmishes, was not important with child victims and should not be considered. Secondly, she discounted the importance of details, another fertile basis for cross-examination and impeachment. Finally, and more subtly, she explained away the importance of inconsistencies in children's testimony.

In no other context in American jurisprudence do we allow a witness, of any type of skill or training, to tell a jury to disregard, in determining credibility, the very factors which we instruct them to consider. In no other type of case do we allow a witness, regardless of background or education, to explain to the jury the inconsistent, non-detailed sketchy testimony of another. Stated succinctly, in no other context, do we allow witnesses to invade the jury's sole province of determining the credibility of the witnesses and finding the facts.

Given the extremely limited evidence in this case, I disagree with the majority's conclusion that the case against defendant was "strong." The admissible evidence against defendant was that of the victim whose testimony was impeached by inconsistencies, lack of detail, and lack of memory. The majority states that this case does not rest on the unsubstantiated testimony of the victim. In fact, it does just that. Only one witness, the victim, testified to the criminal act on which the state elected to proceed. No physical evidence could corroborate the act. In this context, the clearly inadmissible testimony of the social worker explaining the inconsistencies, sketchiness, and vagueries of the sole witness' testimony cannot be considered harmless.

Equally important to the analysis of the harmfulness of this evidence is the harm which this error casts on the administration of justice. Since the onset of efforts to relax the evidentiary rules in this context, we have steadfastly reminded the bench and bar that the rules must be applied uniformly despite undesired, disgusting results. *See State v. Ballard,* 855 S.W.2d 557 (Tenn.1993). *See also State v. Schimpf,* 782 S.W.2d 186 (Tenn. Crim.App.1989), *perm. to appeal denied,* (Tenn.1990). Notwithstanding the clarity of these rulings, the problems are recurrent and frequent. Upholding the verdict in this case despite error, through the harmless error escape hatch is, in my opinion, a disservice to the administration of justice and a relinquishment of our obligation to uniform application of the law. By rescuing prosecutors who use clearly inadmissible evidence, we encourage them to come closer and closer to the ethical line in their attempts to win these difficult cases. We should, in my opinion, apply the rules of evidence, the very skeleton of our system, consistently and uniformly, despite the dreaded result of overturning the conviction of one charged with a most despicable offense.

REID, J., concurs.