# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs September 14, 2011

## STATE OF TENNESSEE v. EMOE ZAKIAYA MOSI BAKARI

### Appeal from the Criminal Court for Davidson County
### No. 2008-B-1024    J. Randall Wyatt, Jr., Judge

### No. M2010-01819-CCA-R3-CD - Filed February 15, 2012

A Davidson County Criminal Court Jury convicted the appellant, Emoe Zakiaya Mosi Bakari, of attempted rape of a child, a Class B felony, and the trial court sentenced him as a Range I, standard offender to twelve years in confinement. On appeal, the appellant contends that the trial court erred by (1) allowing a State witness to testify about "delayed disclosure" in child sexual abuse cases; (2) allowing a police detective to give testimony suggesting the appellant was uncooperative during the investigation; (3) allowing the State to introduce a photograph of the victims into evidence; and (4) allowing the prosecutor during rebuttal closing argument to give personal examples in an attempt to vouch for the victims' credibility. Based upon the record and the parties' briefs, we conclude that the trial court erred by allowing a State witness to testify about "delayed disclosure," by allowing a police detective to give testimony suggesting the appellant was uncooperative during the investigation, and by allowing the prosecutor to give personal examples in an attempt to vouch for the victims' credibility. Moreover, we conclude that the cumulative effect of the errors warrants reversal of the appellant's conviction. Therefore, the appellant's conviction of attempted rape of a child is reversed, and the case is remanded to the trial court for a new trial.

### Tenn. R. App. 3 Appeal as of Right; Judgment of the Criminal Court is Reversed, and the Case is Remanded.

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which JERRY L. SMITH AND JAMES CURWOOD WITT, JR., JJ., joined.

Jeffery A. DeVasher (on appeal), Tyler Chance Yarbro (at trial), and Jonathan F. Wing (at trial), Nashville, Tennessee, for the appellant, Emoe Zakiaya Mosi Bakari.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Kristen Menke, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## I. Factual Background

The record reflects that in April 2008, the Davidson County Grand Jury indicted the appellant as follows: Count 1, rape of a child; count 2, aggravated sexual battery; count 3, rape of a child; and counts 4 through 7, aggravated sexual battery. In the first two counts, the alleged victim was J.W., who was born on August 10, 1995, and in the remaining counts, the alleged victim was T.V., who was born on October 21, 1998.[1] According to the indictment, all of the offenses occurred between July 22, 2002, and July 22, 2003. The appellant was tried in August 2009. During the trial, the State dismissed the aggravated sexual battery of J.W. in count 2. The jury was unable to reach a verdict on the remaining counts, and the trial court declared a mistrial.

In December 2009, the appellant was retried for raping J.W. in count 1; raping T.V., renumbered as count 2; and aggravated sexual battery of T.V., renumbered as counts 3 through 6. At the close of the State's proof, the State dismissed count 6. The jury later found the appellant guilty of the lesser-included offense of attempted rape of a child in count 1 and not guilty in counts 2 through 5.

Although the appellant does not contest the sufficiency of the evidence, we will describe the evidence presented at the appellant's second trial. Fourteen-year-old J.W. testified that when she was seven years old, her family lived on Navaho Trail in Davidson County. J.W. lived with her older sister; her younger cousin, T.V.; her mother; and her mother's boyfriend, the appellant. One day, J.W. was playing outside when her mother came outside and told her that the appellant wanted her to go inside the house. J.W.'s mother left to run an errand, and J.W. went inside. The appellant was sitting on the couch in the living room, took J.W. by the hand, led her into her mother's bedroom, and put her onto the bed. While J.W. was lying on her back, the appellant pulled her shorts down to her ankles and pulled down his pants. She said he was wearing a clear condom, "[i]nserted his private into mine," and moved "[b]ack and forth." She said that she stared at the ceiling, that the appellant did not say anything to her, and that he did not touch any other parts of her body. Afterward, he told her that he would hurt her mother if she told her mother about the incident. J.W. said she believed the appellant.

J.W. testified that the appellant sexually abused her only one time. She said that she shared a bedroom with T.V. and that the appellant never came into their bedroom while she and T.V. were in the bedroom together. At some point, J.W. told T.V. about what the

---

[1]It is this court's policy to refer to minor victims of sexual offenses by their initials.

appellant had done to her. However, J.W. did not tell her mother until 2007, when J.W. was about eleven years old. She said the appellant moved out of their home shortly before she revealed the abuse to her mother.

On cross-examination, J.W. denied telling her mother that the appellant forced her to perform oral sex on him. She said she revealed the abuse to her mother during a conversation in which her mother "told me to tell her if anybody tried to touch me." She said that when she revealed the abuse to T.V., T.V. told her that the appellant had forced T.V. to "suck his private area." She said she thought she and T.V. slept in separate beds.

Eleven-year-old T.V. testified that when he was four or five years old, he lived with his aunt; the appellant; and his two cousins, one of which was J.W. T.V. and J.W. shared a bedroom. T.V. said that "like, every night [the appellant] would come in [our] room and he would shut it and lock the door and he would try to force us to take our clothes off, but we refused to let him." He said that the appellant would take their clothes off anyway and that the appellant would "touch my private part with his hand." The appellant also used his hands to touch and squeeze T.V.'s buttocks and used his penis to touch T.V.'s buttocks. T.V. said the appellant always touched the outside of his buttocks and never put anything inside of them. The appellant tried to force T.V. to put his hand and mouth on the appellant's penis, but T.V. was able to pull away from the appellant. T.V. said that J.W. always was in the room during the incidents and that the appellant told him something bad would happen if he revealed the abuse. He said he told someone about the abuse when he was ten years old.

On cross-examination, T.V. acknowledged that J.W. helped him fight the appellant and that they pushed, hit, and kicked the appellant. He also acknowledged that he saw the appellant do the same things to J.W. that the appellant did to him and that the appellant forced J.W. to touch T.V.'s private part. However, he denied stating previously that the appellant forced J.W. to put her mouth on T.V.'s private part. He said that the appellant was unable to put the appellant's private part into T.V.'s mouth because T.V. kicked the appellant. He said he never told anyone that the appellant put the appellant's mouth on T.V.'s private part. He said that he shared a bed with J.W. and that the incidents always happened in their bedroom.

On redirect examination, T.V. acknowledged telling an interviewer that the appellant "tried to stick his finger in my behind." He said that the appellant put the appellant's finger into his buttocks and that "I was trying to force him not to do it."

D.M.,[2] J.W.'s mother and T.V.'s aunt, testified that in 2003, she and the appellant lived together on Navaho Trail. J.W., T.V., and D.M.'s older daughter lived with them. J.W. and T.V. shared a bedroom and slept together in a twin bed. Sometimes, D.M. would leave the children in the appellant's care. She said that she trusted the appellant and that the children seemed to love him. In July 2003, she and the appellant ended their relationship. However, they remained friends. In September 2007, when J.W. was twelve years old, D.M.'s older daughter noticed that J.W.'s underwear was in the dirty clothes pile and that the underwear had an odor indicating J.W. might be sexually active. D.M.'s older daughter telephoned D.M. at work and told her about the underwear. That evening, D.M. had a conversation with J.W. about sex. J.W. started crying and claimed the appellant made her have sex with him. D.M. said the victim "told me that it had happened when I was going to pay some bill and I don't know exactly when that was." D.M. telephoned the appellant and the police. At some point, T.V. told D.M. that the appellant also had sexually abused him.

On cross-examination, D.M. acknowledged that J.W. told her the appellant penetrated her vaginally and made her have oral sex with him. D.M. denied that J.W. told her the abuse happened in the bathroom. She acknowledged that J.W. also told her the appellant abused T.V. by forcing T.V. to perform oral sex on the appellant. She acknowledged that she was shocked by J.W.'s allegations and that she never noticed anything different in J.W.'s behavior. When she confronted the appellant, he denied doing anything inappropriate to the victims. On redirect examination, D.M. testified that she thought the appellant's acts with T.V. occurred in the bathroom.

Detective Michael Adkins of the Metropolitan Nashville Police Department testified that he investigated the victims' allegations and spoke with D.M. On October 5, 2007, he interviewed the appellant for about one hour. The appellant thought the victims were making up the allegations because D.M. was jealous and wanted to get back together with him. Detective Adkins said the appellant claimed that his relationship with J.W. was good and that J.W. was "a good kid." Detective Adkins asked the appellant if it was possible the abuse occurred. At first, the appellant said no. Detective Adkins said the appellant then stated, "[A]nything was possible, but I doubt it." Detective Adkins was supposed to meet with the appellant for a second interview several days later. However, on the day of the scheduled interview, the appellant telephoned and said he could not meet with the detective because he had to work. Over the next couple of months, Detective Adkins attempted to contact the appellant and schedule a second interview. Finally, on December 6, 2007, Detective Adkins spoke with the appellant over the telephone. Detective Adkins met with the appellant in the detective's office on December 10, 2007. Detective Adkins said the appellant "kept saying that the only reason that he could think of for this to come up was that her mother was

---

[2]To protect the victims' identities, we will refer to the witness by her initials.

jealous." The interview lasted only nineteen minutes because the appellant left the police department.

On cross-examination, Detective Adkins acknowledged that he spoke with D.M. on September 13, 2007, and that D.M. told him the appellant raped J.W. in the bathroom. D.M. also told him that the appellant forced J.W. and T.V. to perform oral sex on the appellant. On September 18, 2007, D.M. contacted Detective Adkins and told him that T.V. also claimed the appellant abused him. Detective Adkins acknowledged that the appellant voluntarily came to the police department for both interviews and that the appellant said he never touched the victims.

Lisa Dupree testified that she was a social worker for the Our Kids Center, an outpatient clinic of Nashville General Hospital, and that she interviewed the victims in November 2007. She said that during twelve-year-old J.W.'s interview, J.W. described "penile genital penetration" by the appellant. She said J.W. also told her, "I don't know if it went all the way in me, but he wanted to put it in me and he kept saying he wanted me." J.W. thought she was seven years old when the rape occurred. Dupree said she was not surprised J.W. waited so long to report the abuse because "roughly 70 or 80 percent of the kids we see are kids that have reported either days or weeks or months or years after the event." She said that during T.V.'s interview, he claimed that the appellant touched his genital area and buttocks. T.V. also claimed that the appellant also forced him to look at the appellant's penis and touch the appellant.

On cross-examination, Dupree acknowledged that J.W. never said the appellant wore a condom or that J.W. saw the appellant abuse T.V. Dupree also acknowledged that T.V. never mentioned oral sex and never said the appellant penetrated him. She said that the typical delay in reporting sexual abuse was three to five days and that "we report what children . . . report to us and we report what we find on the medical exam. We are not commenting on the validity of an allegation."

Sue Ross, a pediatric nurse practitioner at the Our Kids Center, testified as an expert in pediatric forensic examination about the physical examinations performed on the victims. Although the doctor who examined J.W. and T.V. was unavailable to testify at trial, Ross testified from his reports. J.W.'s examination was normal, and the doctor found no evidence of sexual penetration. Ross said that J.W.'s examination may have been normal because full penetration into J.W.'s vagina did not occur. She explained that if a penis penetrated a child's vagina prior to the child's reaching puberty, lack of injury to the vagina would be unlikely. She said that T.V.'s examination also was normal and that the "vast majority" of children examined at the Center had normal exams. On cross-examination, Ross testified that at the time of the examinations, J.W. had not started menstruating but "certainly was

beginning puberty." She acknowledged that the injury to J.W.'s vagina could have healed by the time the doctor examined J.W.

Latoya Mitchell, a forensic interviewer with the Nashville Children's Alliance, testified that she interviewed the victims. At the time of the interviews, J.W. was twelve years old and T.V. was eight years old. Mitchell said J.W. told her that the appellant "tried and tried to put his private area into her private area and then it went in." J.W. also told Mitchell that the rape hurt and that the appellant was wearing a condom. Mitchell said T.V. told her that the appellant touched his private part "almost every day." The appellant went into the bedroom T.V. shared with J.W. and pulled off their clothes. T.V. claimed he and J.W. punched the appellant, pushed him out of their room, closed the bedroom door, and put their clothes back on. Mitchell said T.V. also claimed that the appellant "squeezed his bootie and was sticking his finger in his butt," that the appellant made T.V. touch the appellant's penis, and that T.V. saw the appellant "stick his finger in [J.W's] bootie and private part."

On cross-examination, Mitchell testified that both of the victims said the appellant "raped" them. J.W. told Mitchell that during her rape, she told the appellant to stop and kicked him in the stomach. The appellant told J.W. to get out, and J.W. went back outside. Mitchell acknowledged that T.V. never claimed the appellant made him and J.W. perform sexual acts on each other.

At the close of the State's proof, the State elected the following offenses: count 1, rape of a child, the appellant penetrated J.W.'s genital area with the appellant's penis in D.M.'s bedroom; count 2, rape of a child, the appellant penetrated T.V.'s rectum with the appellant's finger in T.V.'s bedroom; count 3, aggravated sexual battery, the appellant fondled and squeezed T.V.'s buttocks with the appellant's hand in T.V.'s bedroom; count 4, aggravated sexual battery, the appellant fondled T.V.'s penis and genital area with the appellant's hand in T.V.'s bedroom; and count 5, aggravated sexual battery, the appellant rubbed his penis against T.V.'s buttocks in T.V.'s bedroom. As stated previously, the jury found the appellant guilty of the attempted rape of J.W. in count 1 and acquitted him of the remaining charges. After a sentencing hearing, the trial court ordered that the appellant serve twelve years in confinement.

## II. Analysis

### A. Delayed Disclosure in Child Sexual Abuse Cases

The appellant claims that the trial court erred by allowing Lisa Dupree to testify about "delayed disclosure" in child sexual abuse cases because "Tennessee courts have consistently rejected expert testimony dealing with behavioral characteristics of offenders or victims in

order to prove that a certain crime did or did not occur as alleged." Moreover, the appellant contends that the State cannot circumvent the rules of evidence regarding expert witnesses by not presenting Dupree as an expert witness. The State argues that the trial court properly allowed Dupree to testify about delayed disclosure because Dupree simply testified that "in her experience, most children do not report sexual abuse immediately." We conclude that the trial court erred by allowing Dupree to give expert testimony about delayed disclosure but that the error was harmless.

Before the appellant's second trial, he filed a motion to exclude Dupree's testimony about delayed disclosure in child sexual abuse cases, arguing that the purpose of the testimony was to bolster the victims' credibility.[3] At the hearing on the motion, the State informed the trial court that although Dupree had testified as an expert witness during the appellant's first trial, she would not testify as an expert at the second trial. The defense responded that "we are going to object to any testimony whether she is qualified as an expert or not about the likelihood of delayed disclosure how common that is. We think the case law is very much on point on that, your Honor."

At the hearing, Dupree testified that she was a licensed clinical social worker with a masters degree in counseling and a bachelors degree in social work. She said she had worked at the Our Kids Center for seventeen years, interviewing children and collecting information about their medical histories. She estimated that during her employment at the Center, she had interviewed 5,000 to 8,000 children. She interviewed J.W. and T.V. in September 2007, four years after the alleged abuse. The State asked her if it was "odd" that the victims waited to report the abuse, and she said no. She explained,

> Roughly just recalling our data, anywhere from 75 to 80, 85 percent of our children that come to us come with an allegation that is not acute, which means that it is older than five days. It can be anywhere from several days to several weeks to several months to several years and that, that describes literally anywhere between 75 and 85 percent of our population.

She also stated, "It certainly does not mean that the allegation is true and I would not say that delayed disclosure, you know, equals truth . . . . It simply is the norm." She said it was important for the Center to know about a child's delayed disclosure in order to determine how to treat the child and interpret certain medical test results.

On cross-examination, the defense asked Dupree why her information about delayed

---

[3]Dupree had testified about delayed disclosure during the appellant's first trial.

disclosure was relevant to the appellant's trial. Dupree answered that "we are in a constant sort of process of educating parents that most children who are victims do not tell immediately. . . . So I don't know about outside of that, but I certainly know the parents that we see and the adults we see think that children will tell immediately."

The defense argued that the only reason the State intended to have Dupree testify at trial about delayed disclosure was to show that "despite the delay the children are still being truthful and should be believed. That is bolstering." Defense counsel cited three cases, including State v. Anderson, 880 S.W.2d 720, 721-22 (Tenn. Crim. App. 1994), that it claimed clearly prohibited such testimony.[4] The State argued that "the case law is wrong" and that Dupree should be allowed to testify because the defense was going to argue to the jury that the victims should not be believed due to their delayed disclosures. The State also argued that the trial court should not exclude Dupree's testimony because Dupree was not going to testify as an expert, was going to speak "from her general knowledge," and was not going to confirm or deny the abuse occurred. The trial court asked defense counsel if he was going to "suggest or imply to the jury . . . that it is unusual that the child did wait for years?" Counsel answered, "Yes your Honor, and I think that is done in many cases in fact it [was] done in Anderson." The trial court commented that "you want your cake and eat it too."

In a written order, the trial court ruled that Dupree could not testify about why J.W. and T.V. may have delayed reporting the abuse. However, the court concluded that because Dupree was not going to testify as an expert, "the concern of the Anderson Court is no longer an issue." The court held that "because the Defendant will be challenging the four year delay in the alleged [victims'] disclosure, the State will be permitted to provide a proper context for the delay and ask Ms. Dupree how often delayed disclosure occurs in her own experience."

Tennessee Rule of Evidence 702, regarding expert witnesses, provides, "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." In order for expert testimony to be admissible, the witness must be an expert, the subject matter of the witness's testimony must be proper, the subject matter must conform

---

[4]The defense also relied on State v. David Andrew Nicholson, No. 03C01-9901-CR-00035, 2000 Tenn. Crim. App. LEXIS 85 (Knoxville, Feb. 2, 2000). However, on September 11, 2000, our supreme court designated the opinion "Not for Citation" when denying Nicholson's application for permission to appeal. According to Rule 4(F)(1), Rules of the Supreme Court of Tennessee, opinions designated not for citation have no precedential value.

to a generally-accepted explanatory theory, and the probative value of the witness's testimony must outweigh its prejudicial effect. State v. Williams, 657 S.W.2d 405, 412 (Tenn. 1983). It is well-settled that the allowance of expert testimony rests within the sound discretion of the trial court. State v. Rhoden, 739 S.W.2d 6, 13 (Tenn. Crim. App. 1987).

In State v. Schimpf, 782 S.W.2d 186, 193-194 (Tenn. Crim. App. 1989), our court held that a clinical psychologist could not testify about child sexual abuse syndrome, the group of signs and symptoms characteristic of sexually abused children, because the expert's testimony "invaded the jury's province by offering testimony which ultimately went to [the victim's] credibility." In State v. Jerrell C. Livingston, C.C.A. No. 01-C-01-9012-CR-00337, 1991 Tenn. Crim. App. LEXIS 770, at *33 (Nashville, September 17, 1991), a panel of this court, relying on Schimpf, concluded that a clinical psychologist should not have been allowed to testify about the concept of delayed disclosure because the evidence "was offered for no other purpose than to buttress the victim's credibility."

In State v. Ballard, 855 S.W.2d 557, 563 (Tenn. 1993), our supreme court agreed with Schimpf and concluded that an expert witness could not testify about the various behavioral traits associated with child victims of sexual abuse. The court explained,

> This "special aura" of expert scientific testimony, especially testimony concerning personality profiles of sexually abused children, may lead a jury to abandon its responsibility as fact finder and adopt the judgment of the expert. Such evidence carries strong potential to prejudice a defendant's cause by encouraging a jury to conclude that because the children have been identified by an expert to exhibit behavior consistent with post-traumatic stress syndrome, brought on by sexual abuse, then it is more likely that the defendant committed the crime.

Id. at 561.

At the pretrial hearing in this case, the appellant relied heavily on Anderson. In Anderson, the defendant was convicted of six counts of aggravated rape against the victim, who was six years old at the time of the abuse. 880 S.W.2d at 721-22. At trial, the eight-year-old victim testified about the sexual acts he and the defendant performed on each other. Id. However, the evidence showed that the victim had recanted his allegations against the defendant on four separate occasions to five different people. Id. at 722. In the State's rebuttal case, a licensed clinical social worker was allowed to testify as an expert over the defendant's objection about "delayed disclosure" and "recantation" by child sexual abuse victims. Id. at 728. She testified that recantation was "'very common'" and "'a predictable

phenomena.'" Id. This court, relying on Schimpf and Ballard, stated,"[A] relatively clear rule of law: child sex abuse may not be proven by evidence that the victim exhibited residual characteristics or behavioral traits similar to other victims of such abuse." Id. at 730. Concluding that "[t]he only possible value of these comments, in the context of the trial, was to accredit the testimony of the victim," the court ruled that the trial court had erred by allowing the social worker to testify. Id. Moreover, because the State's case relied primarily on the victim's testimony, the court could not find that the error was harmless and reversed the defendant's convictions. Id.

In State v. Bolin, 922 S.W.2d 870, 871 (Tenn. 1996), also cited by the appellant at the hearing, the defendant was convicted of aggravated sexual battery of a nine-year-old girl. During the trial, a social worker testified on cross-examination by the State and over the defendant's objection that children sexually abused over a long period of time or on multiple occasions had difficulty remembering "when, where and how each event takes place." Id. at 873. On appeal, the State argued that the witness's testimony did not violate Ballard because the social worker did not testify as an expert. Id. Our supreme court disagreed, stating,

> [I]t is true that the social worker was not formally qualified as an expert. However, it is also true that the average juror would not know, as a matter of course, that abused children often confuse or forget the specific dates of the abuse. Therefore, the testimony was clearly "specialized knowledge" intended to "substantially assist the trier of fact to understand the evidence or to determine a fact in issue," Tenn. R. Evid. 702. Thus, it constitutes expert proof. Because the social worker's testimony is closely related to the child sexual abuse syndrome . . . we conclude that it violates the rule enunciated in Ballard and that its admission was error.

Id. at 874.

Turning to the instant case, we initially note that the State's brief fails to address even one case relied on by the appellant at the pretrial hearing or on appeal. Instead, the State primarily contends that the trial court properly allowed Dupree to testify about delayed disclosure because she did not testify as an expert.

We find it particularly telling that the State formally qualified Dupree as an expert at the first trial but not the second trial. In any event, Dupree testified at the pretrial hearing that 75 to 85 percent of children do not reveal sexual abuse for days, weeks, months, or years.

-10-

She also testified that most people assume child victims of sexual abuse reveal the abuse immediately. Because the average juror would not know that most victims delay disclosure, we conclude that Dupree had "specialized knowledge" used to "substantially assist the trier of fact to understand the evidence or to determine a fact in issue." Dupree gave expert testimony regarding delayed disclosure in this case and should have been qualified as an expert before she was allowed to testify.

Moreover, we conclude that the only purpose for offering Dupree's testimony was to bolster the victims' credibility. The defense asked Dupree why her testimony about delayed disclosure would be relevant in the appellant's trial. Dupree could offer no reason other than the information generally would help parents of victims. Therefore, we agree with the appellant that the trial court erred by allowing Dupree to give expert testimony about delayed disclosure.

Next, we must determine whether the error was harmless. "Non-constitutional errors identified by our supreme court include most evidentiary rulings." State v. Bowman, 327 S.W.3d 69, 91 (Tenn. Crim App. 2009). For non-constitutional errors, a defendant challenging a conviction has the burden of demonstrating that the error "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b); State v. Rodriguez, 254 S.W.3d 361, 372 (Tenn. 2008).

Turning to the instant case, the jury convicted the appellant of attempted rape of J.W. as a lesser-included offense of rape of a child and acquitted him of all of the charges related to T.V. Under such circumstances, we conclude that the appellant has failed to demonstrate that this error alone more probably than not affected the judgment.

### B. Police Investigation

The appellant contends that the trial court erred by allowing Detective Adkins to testify about facts that suggested the appellant was uncooperative during Detective Adkins's investigation. The appellant argues that the detective's testimony was akin to an improper comment on the appellant's right to remain silent. The State argues that Detective Adkins's testimony was proper. We conclude that the trial court erred by allowing the testimony but that the error was harmless.

Before trial, the appellant filed a motion in limine to prohibit Detective Adkins from testifying that after the appellant's first interview, the appellant appeared to avoid the detective and did not meet with Detective Adkins for the second interview for a couple of months. At a hearing on the motion, the State argued, "[These] are the facts of the case and it is unfortunate that the defense doesn't like them, but there is no legitimate reason why they

wouldn't come in." The trial court ruled,

> I think that that can be asked about, because . . . I think if you
> did not allow anything at all to explain what happened you could
> think that the police officer was lazy or they did not even pursue
> the [second] interview or didn't even care about, you know,
> looking into all of this and I think within reason not to go on
> forever but that could be mentioned that it took a little time to
> get a hold of Mr. Bakari.

At trial, Detective Adkins testified that he met with the appellant on Friday, October 5, 2007. He said the interview lasted about an hour and that it ended because the appellant "stated that he needed to get to work." They scheduled an interview for the following Monday, but the appellant telephoned the detective and canceled the interview because he had to work. The appellant was supposed to call Detective Adkins to schedule a second interview but never did. Detective Adkins said,

> [F]or the next couple of months I made several attempts to
> contact Mr. Bakari to try and get a second interview and was
> unable to until I believe December 6, 2007 I finally was able to
> get him on the phone and he agreed to come in for an interview
> a couple of days later, I believe on December 10, 2007.

The appellant voluntarily came to the police department for the second interview as scheduled. However, the appellant terminated the interview after only nineteen minutes.

The Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution generally provide a privilege against self-incrimination to individuals accused of criminal activity, which includes a right to remain silent. Case law clearly establishes that a defendant may not be punished at trial for exercising his constitutional right to remain silent after arrest. See Doyle v. Ohio, 426 U.S. 610, 618 (1976); Braden v. State, 534 S.W.2d 657, 660 (Tenn. 1976). Therefore, the prosecution generally may not comment at trial regarding a defendant's invocation of his right to remain silent. See Braden, 534 S.W.2d at 660; State v. Marlin C. Goff, No. E2005-02090-CCA-R3-CD, 2006 Tenn. Crim. App. LEXIS 696, at *28 (Knoxville, Sept. 14, 2006). However, in this case, the appellant voluntarily met with Detective Adkins for two interviews, and he was not under arrest when he spoke with the detective. Therefore, we conclude that the detective's testimony was not a comment on the appellant's right to remain silent.

Nevertheless, we conclude that the trial court erred by overruling the appellant's

motion in limine. The trial court determined that the detective's testimony was relevant to explain the time delay between the appellant's first and second interviews. We disagree. It is highly unlikely that the jury would have placed any significance on the three-month delay, let alone attributed the delay to laziness or lack of interest by the police. In our view, the only purpose for the detective's testimony was to insinuate to the jury that the appellant was trying to avoid him and was not cooperating with his investigation. However, the appellant was under no obligation to speak with or cooperate with Detective Adkins. The State has offered no other explanation for how the detective's testimony was relevant in this case. See Tenn. R. Evid. 401. Therefore, we conclude that Detective Adkins's testimony was improper. However, for the same reason stated in the previous section, we again conclude that that the appellant has failed to demonstrate that this error alone more probably than not affected the judgment. Tenn. R. App. P. 36(b); Rodriguez, 254 S.W.3d at 372.

C. Photograph

Next, the appellant contends that the trial court erred by allowing the State to introduce a photograph of the victims into evidence because the photograph was irrelevant. The appellant also argues that even if the photograph was relevant, its relevance was outweighed by the danger of unfair prejudice. The State claims that the trial court properly allowed the photograph to be introduced into evidence. We conclude that the trial court did not abuse its discretion by admitting the photograph.

The photograph, which was taken about the time of the alleged abuse, is four and one-half inches wide by five and three-fourth inches long. It shows the victims from the waist up and posing in front of a gray background. They are hugging each other and smiling. Before trial, the appellant filed a motion to exclude the photograph, arguing that it would evoke sympathy for the victims. At a hearing on the motion, the State argued that the photograph was relevant to show "the age and the size and the appearance of these children at the time that this occurred." At first, the trial court agreed with the appellant and ruled that the photograph was irrelevant. However, the State asked that the trial court reconsider its ruling because the defense intended to impeach the victims "at every turn," and, therefore, the photograph was relevant to show "how big they are or whether or not they are intimidated, why they are or are not saying anything. Why they are or are not able to fight somebody off." The trial court agreed with the State and held that the photograph was admissible.

The State introduced the photograph into evidence through D.M., who acknowledged that the photograph was taken when J.W. and T.V. were about seven and four years old, respectively. During the State's rebuttal closing argument, the prosecutor stated as follows:

-13-

These two children right here that are in that picture they are the ones that I want you to be thinking about and they are the ones that I want you to vision for the rest of the time that I talk to you, because these are the two children at the ages that they were when these events happened. This is how tiny they were. This is how innocent they were.

The defense did not object to the prosecutor's statements.

The decision regarding the admissibility of photographs lies within the trial court's discretion. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). In order to be admitted as evidence, a photograph must be relevant to an issue at trial. Tenn. R. Evid. 402; State v. Braden, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993). As stated previously, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403.

Granted, the photograph of the victims was somewhat prejudicial to the defense. However, given evidence that J.W. and T.V. fought with the appellant, their sizes at the time of the offenses was relevant. Therefore, we cannot say that the trial court abused its discretion by ruling that the photograph was admissible.

### D. Closing Argument

Finally, the appellant contends that the trial court erred by allowing the prosecutor to give personal examples during closing argument as a means of vouching for the victims' credibility. The State contends that the appellant is not entitled to relief because the jury's verdicts demonstrate that the appellant was not prejudiced by the prosecutor's comments. We conclude that the prosecutor's statements were improper and that the cumulative effect of the statements with the other errors warrants a new trial.

Before the State gave its rebuttal closing argument, defense counsel asked for a bench conference. During the conference, defense counsel stated that it would be "forced" to object if the prosecutor personally vouched for the victims' credibility. The trial court warned the prosecutor that "you do not need to get too personal, just avoid that." During the prosecutor's rebuttal closing argument, she stated, "I remember back in the summer I was talking to a friend of mine's 5-year-old and he was telling me all about being at summer camp --[.]" The defense objected, but the trial court stated, "She is making a closing

argument . . . . This is not evidence." The prosecutor continued as follows:

> In the summertime I was talking to a friend of mine's child a 5-year-old about what he was doing at summer camp and how excited he was about being at summer camp and so on and so forth and he said I am learning to swim and I can hold my breath under water now, so I said really how long can you hold your breath for and he says, 20 hours, and I am like 20 hours that is almost a whole day. He thinks about it for a second and he goes okay, well, really it was more like four hours, because that is the world that a 5-year-old lives in. It is the world that a 4-year-old lives in.

Later, the prosecutor stated, "I am 33-years-old. I have been married to my husband for three years and we have been together for 12. I can no more tell you about every sexual event that occurred --[.]" Defense counsel objected, and the trial court stated, "Just look, continue on, she is [giving] the argument giving some kind of examples of whatever it is, would you please go ahead." The prosecutor continued as follows:

> -- a year ago, much less half my life time about, but that is what we as adults are expecting out of these children. We want them to talk about something that happened half of their lifetime ago and to give every detail, what you were wearing, where were you, what position were you in, and don't mess anything up because once again if you do we are not going to believe you.

It is well-established that closing argument is an important tool for both parties during a trial and, therefore, that counsel is generally given wide latitude during closing argument. See State v. Carruthers, 35 S.W.3d 516, 577-78 (Tenn. 2000) (appendix). Nevertheless, "arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003).

"In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." State v. Pulliam, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996). In connection with this issue, we must examine the following factors:

> "(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case[;]

-15-

(2) the curative measures undertaken by the court and the prosecution[;]

(3) the intent of the prosecutor in making the statement[;]

(4) the cumulative effect of the improper conduct and any other errors in the record[; and]

(5) the relative strength or weakness of the case."

Id. (quoting Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

In Goltz, 111 S.W.3d at 6, this court outlined "five general areas of prosecutorial misconduct" that can occur during closing argument: (1) intentionally misleading or misstating the evidence; (2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt; (3) making statements calculated to inflame the passions or prejudices of the jury; (4) injecting broader issues than the guilt or innocence of the accused; and (5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge.

Turning to the instant case, we agree with the appellant that the prosecutor used personal examples as a way to vouch for the victims' credibility. Although the trial court instructed the jury during the charge that "remarks of counsel are intended to help you in understanding the evidence and applying the law, but they are not evidence," the prosecutor's statements were not brief and were made despite the trial court's warning not "to get too personal." The victims' testimony was the primary evidence against the appellant, and the fact that the jury found him guilty only of the lesser-included offense of attempted rape of J.W. demonstrates the weakness of the State's case. Finally, we have determined that additional errors are in the record. The cumulative effect of the prosecutor's statements with the other errors leads us to conclude that the appellant's conviction should be reversed.

### III. Conclusion

Based upon the record and the parties' briefs, we conclude that the errors committed in this case warrant reversal of the appellant's conviction of attempted rape of a child. The appellant's conviction is reversed, and the case is remanded to the trial court for a new trial.

_____

NORMA McGEE OGLE, JUDGE

-16-