IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 13, 2015 Session


**TIMOTHY GUILFOY v. STATE OF TENNESSEE**


**Appeal from the Criminal Court for Davidson County**
**No. 2011-A-779     Monte Watkins, Judge**

_____


**No. M2014-01619-CCA-R3-PC – Filed August 14, 2015**
_____


The Petitioner, Timothy Guilfoy, appeals from the denial of his petition for post-conviction relief. On appeal, the Petitioner argues that he received ineffective assistance of counsel. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

James O. Martin, III, and Patrick T. McNally, Nashville, Tennessee, for the Appellant, Timothy Guilfoy.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Victor S. Johnson III, District Attorney General; and Roger Moore, Assistant District Attorney General, for the Appellee, State of Tennessee.


**OPINION**


*Trial*


On direct appeal, this court summarized the procedural history of the case and the facts at trial as follows:[1]

---

[1] To assist in the resolution of this proceeding, we take judicial notice of the record from the Petitioner's direct appeal. See Tenn. R. App. P. 13(c); State v. Lawson, 291 S.W.3d 864, 869 (Tenn. 2009); State ex rel Wilkerson v. Bomar, 376 S.W.2d 451, 453 (Tenn. 1964).

In June 2009, [the Petitioner] was charged with three counts of aggravated sexual battery against J.A.,[2] a victim less than thirteen years old; two counts of aggravated sexual battery against T.A., a victim less than thirteen years old; four counts of aggravated sexual battery against A.A., a victim less than thirteen years old; and four counts of rape of a child against A.A. All of the aggravated sexual battery offenses were alleged to have taken place "on a date between October 1, 2005 and September 20, 2008." All of the rape of a child offenses were alleged to have taken place "on a date between July 1, 2007 and September 30, 2008." On March 30, 2011, the State entered a nolle prosequi as to these charges.

On March 11, 2011, [the Petitioner] was charged with four counts of aggravated sexual battery against J.A., a victim less than thirteen years old (Counts One through Four); one count of aggravated sexual battery against T. A., a victim less than thirteen years old (Count 5); and three counts of rape of a child against T.A. (Counts Six through Eight). All of these offenses but the one alleged in Count Eight were alleged to have taken place "on a date between October 1, 2005 and September 30, 2008." The offense alleged in Count Eight was alleged to have occurred "on a date between July 1, 2007 and September 30, 2008."

[The Petitioner] initially was tried before a jury in July 2011, and a hung jury resulted. [The Petitioner] was retried before a jury in October 2011, during which the State nolled Count Five. At [the Petitioner]'s second jury trial, the following proof was adduced:

Jennifer A., the victims' mother ("Mother"), testified that, when she and her three daughters moved to Nashville from Indiana in 2005, they began living at the Biltmore Apartments. Her father, Brian Schiff ("Grandfather"), was living there at the time, and they moved in with him. It was a two-bedroom apartment, and she described the living conditions as "pretty crunched." After several months, Grandfather purchased a nearby house on Saturn Drive, and they all moved into the house. Mother stated that, when they moved into the house on Saturn Drive, it had an unfinished basement and an unfinished attic. She used the attic as her bedroom except in the summertime. The girls slept on the main floor but did not have their own separate bedroom. The girls' sleeping accommodations included a bunk bed, a futon, and a couch that pulled out to a bed. Usually, J.A. slept in the top bunk of the bunk bed.

---

[2] As is the policy of this court, minor victims are identified by their initials.

While they were still living in the apartment, Mother became acquainted with [the Petitioner]. He and his roommate lived next door to them. [The Petitioner] came to visit Mother and her family in Mother's apartment. Mother and her family also visited [the Petitioner] in his apartment. Mother described their relationship as "friends" and denied that there was ever any romantic interest on either her or [the Petitioner]'s part. She added that [the Petitioner] was a "really good friend."

Not long after Mother and her family moved to the house on Saturn Drive, [the Petitioner] moved out of his apartment to another location in Nashville. [The Petitioner] visited them at their house on Saturn Drive. A few months later, [the Petitioner] moved to Missouri. [The Petitioner] continued to stay in touch through phone calls and visits.

Mother explained that [the Petitioner] worked in marketing tours and would come to Nashville to participate in events such as the "CMA festival." He usually would drive to town in a tour vehicle, and he would stay with Mother and her family at the Saturn Drive house. In this way, he was able to keep the per diem he was paid for hotels. Mother stated that she and her daughters enjoyed having [the Petitioner] stay with them.

Mother stated that it was not her intention that [the Petitioner] spend the night sleeping in any of the girls' beds, but she knew that he did because she would find him in one of their beds in the morning. She remembered one particular occasion when she saw [the Petitioner] in bed with J.A. in the top bunk of the bunk bed. At that time, the bunk bed was in the dining room. She also recalled finding [the Petitioner] in bed with T.A. on "[m]ultiple" occasions. She did not say anything to [the Petitioner] about his presence in bed with her children.

In May of 2008, Mother, the girls, and [the Petitioner] planned a camping trip to celebrate J.A. and Mother's birthdays, which were close together in time. Mother stated that they camped two nights, and everyone had a good time.

Mother decided that she wanted to leave Nashville and move to Clarksville. [The Petitioner] had expressed an interest in real estate investment, specifically, purchasing a house and renting it out. When Mother told him she was interested in moving to Clarksville, he purchased a house there, and she rented it from him. She stated that the rent was $700 a month. She also testified that [the Petitioner] told her that she "wouldn't ever have to worry about just being kicked out of the house." Mother

testified that [the Petitioner] realized that she "might not always be able to come up with seven hundred dollars." She also stated that [the Petitioner] was welcome to spend the night there. She added that it "was supposed to be a permanent move."

One morning in Clarksville, after the girls had gotten on the bus to go to school, Mother spoke with Grandfather over the phone. Grandfather told her that J.A. had told him "what happened." After her conversation with Grandfather about what J.A. had told him, Mother retrieved her daughters from school. Mother subsequently spoke with J.A. and T.A. and then she called 911. Two deputies from the Montgomery County Sheriff's Department responded and she relayed to them what J.A. and T.A. had told her. Mother testified that she called the police regarding the instant allegations on or about March 15th, 2009. [The Petitioner] had been there three days previously.

In conjunction with the ensuing investigation, Mother made several recorded phone calls to [the Petitioner]. She made these calls in March 2009. Mother and her family remained in [the Petitioner]'s house for about one more month. [The Petitioner] did not serve her with an eviction notice.

On cross-examination, Mother admitted that she and [the Petitioner] had a formal lease agreement regarding the house. She did not mail rent payments to [the Petitioner] but deposited them twice a month into a bank account [the Petitioner] had established. She also admitted that, whenever [the Petitioner] came to visit, her daughters "rushed to the door and hugged him." She did not see either J.A. or T.A. acting frightened around [the Petitioner]. She acknowledged that, when J.A. was six and seven years old, she was wetting the bed and wore pull-ups.

Mother testified that, when [the Petitioner] was staying with them, she usually fell asleep before he did. She did not tell him where to sleep. While they were living on Saturn Drive, the girls would fight over who got to sleep with [the Petitioner]. She did not intervene in these discussions.

Mother acknowledged that she and her daughters moved to Clarksville in September 2008. She already had been attending a junior college in Clarksville during the summer months. She was not able to pay September's rent, so [the Petitioner] told her that she could pay it later by increasing the rent due in subsequent months. In October, she dropped out of school. She paid part of her rent for the months of October and November. She got a job in December and was able to pay December and

January rent. She was fired in February. She earlier had told [the Petitioner] that she would file her federal income tax return early in order to get her refund and pay him some of the money she owed him. She, however, did not get a refund. Mother remained in the house through at least a portion of May.

Mother admitted that, in early March 2009, [the Petitioner] told her that he was having a hard time making the mortgage payments on the house. She denied that he told her that, if she could not pay the rent, he would have to get a tenant who could.

J.A., born on May 22, 2000, and eleven years old at the time of trial, testified that she had two older sisters, T.A. and A.A. She began living in Nashville "quite a few years ago" in an apartment. She lived with her sisters, Mother, and Grandfather. [The Petitioner], whom J.A. identified at trial, lived in the apartment next door.

J.A. and her family later moved into a nearby house. The house had a basement, attic, and main floor. Sometimes, Mother used the attic as her bedroom. Grandfather used the basement as his living area. Sometimes the girls used the dining room as their bedroom. They used a regular bed and a bunk bed. J.A. usually slept in the upper bunk bed.

Sometimes [the Petitioner] would spend the night at the house. On some of these occasions, [the Petitioner] would sleep in J.A.'s bunk bed with her. J.A. testified that, on one of these occasions, [the Petitioner] touched her "private" with his hand. She stated that he touched her skin by putting his hand down the front of her pants. She also stated that his hand moved and that she got up and went to the bathroom. She then went to sleep with one of her sisters. J.A. testified that [the Petitioner] touched her in this manner on more than one occasion. J.A. stated that, when [the Petitioner] touched her while in bed with her, she was not sure if [the Petitioner] was awake at the time the touchings occurred.

J.A. also testified that, at another time, she was sitting on [the Petitioner]'s lap on the couch. [The Petitioner] put his hand down the back of her pants and then slid his hand under her legs. He touched her "private" on her skin. When shown a drawing of a girl's body, J.A. identified the genital region as the area she referred to as her "private."

- 5 -

J.A. went camping with her family and [the Petitioner] for J.A.'s eighth birthday. This trip occurred after the touchings about which J.A. testified. [The Petitioner] did not touch her inappropriately on this trip.

After a while, J.A. decided to tell Grandfather what had happened. This was some time after she and her family left the house on Saturn Drive and moved into a house in Clarksville that [the Petitioner] owned. Grandfather remained in the house on Saturn Drive. When she told Grandfather what [the Petitioner] had done, he told her to tell Mother. She did not do so, however, because she did not think Mother would believe her. Some time later, Grandfather told Mother what J.A. had told him but did not identify [the Petitioner]. J.A. then told Mother what had happened. According to J.A., Mother then told her boyfriend. J.A. and T.A. went to school, but Mother came and got them out of school a little later. She took them home and "called the cops." J.A. subsequently was interviewed by a woman named Anne. The interview was videotaped. J.A. also visited a doctor, who examined her. She did not remember what she told the doctor but testified that she would have told the truth.

On cross-examination, J.A. stated that the touching on the couch occurred while she was in second grade. At the time, her sisters were in the room with her. Also home at the time were Grandfather, her grandmother, Mother, and Mother's boyfriend, "Bob-o." J.A. acknowledged that [the Petitioner]'s visits were sometimes short, and he did not spend the night. She and her sisters were glad to see [the Petitioner] during his visits. She did not remember [the Petitioner's] taking her anywhere by herself. He never said anything to her that made her uncomfortable.

J.A. admitted that, at the time the touchings occurred, she wore a "pull-up" because she had a problem with bed-wetting. She stated that she did not know if she was wearing a pull-up when [the Petitioner] touched her on the occasions she testified about. She also stated that [the Petitioner] had been lying behind her and she was facing away from him. She did not know if he was awake or asleep when the touching occurred. She stated that she had watched the videotape of her interview twice.

On redirect examination, J.A. stated that the only thing about [the Petitioner] she did not like was the touchings. She never got mad at him or fought with him. She never saw her sisters or Mother be mad at him. When asked how many times [the Petitioner] touched her inappropriately, she responded, "Maybe three or four times."

T.A., born on February 26, 1999, and twelve years old at the time of trial, testified that she currently lived in Florida with her two sisters, her brother, her father, and her stepmother. She previously had lived in Nashville with her two sisters, Mother, and Grandfather. She was the middle of three daughters.

T.A. identified [the Petitioner] and stated that he lived next door to them while they lived in an apartment in Nashville. T.A. and her family later moved to a house on Saturn Drive. She stated that, while the family lived there, they frequently changed the furniture arrangements because the house was small. At one point, the family room was set up with a bunk bed and a futon. Another time, the bunk bed and a queen-size bed were in the dining room. Usually, T.A. and J.A. slept in the bunk bed, with T.A. on the bottom bunk. T.A.'s older sister, A.A., usually slept in the queen-size bed. Sometimes, T.A. would sleep on the futon in the family room to "get away from [her] sisters."

T.A. testified that [the Petitioner] spent the night at the house on Saturn Drive "maybe three times." On these occasions, [the Petitioner] slept in the family room or the dining room. On one particular occasion, [the Petitioner] slept in T.A.'s bed. She testified: "I was about to go to bed. It was either on the futon or the bunk bed. I'm not too sure. He had climbed in the bed, and I was already laying down. And he rolled me over and put his hand down my pants." [The Petitioner] touched her "private part" with his finger, on her skin. She added that [the Petitioner]'s finger "went inside [her] private part." She left her bed and got in bed with her big sister. She added that she was "not too sure" if [the Petitioner] was awake when this occurred.

T.A. testified that, on another occasion, she was laying on her bunk bed when [the Petitioner] came in and started touching her. She tried to get up, but he held her down. He touched her private part with his finger again, and she "just started crying." She got up, telling him that she had to go to the bathroom. She left and stayed away. T.A. stated that [the Petitioner] had touched her on "[t]he inside." She also stated that this episode caused her to "want to puke."

T.A. testified that, in response to [the Petitioner]'s actions, she started wearing khaki pants to bed because they did not have an elastic waistband. She stated that [the Petitioner] touched her another time while she was wearing her khaki pants and that he unzipped and unbuttoned

them. This happened on her bunk bed. She testified, "[h]e touched me with his finger on [her] private part on [her] skin on the inside."

T.A. testified that the Defendant touched her more than three times. The touchings were similar to one another. When asked to indicate on a drawing the parts of the body that the Defendant touched, T.A. indicated the female genitalia. When asked what she meant by "inside," she indicated, as reported by the prosecutor for the record, "the outer labia of the female genitalia."

T.A. stated that the touchings occurred before the family camping trip that they took for J.A.'s eighth birthday. She stated that she never told anyone about the touchings. She recalled J.A. telling Grandfather, however, and she remembered when Mother spoke with them while they were waiting for the school bus. T.A. testified that J.A. told Mother what had happened and that Mother began to cry. Both the girls began to cry, too. Nevertheless, the girls got on the bus and went to school.

Mother picked them up from school early that day, and they went to the District Attorney's office. There, T.A. spoke with Anne Fisher. T.A. since had watched the videotape of her interview with Fisher. After the interview, T.A. was examined by a doctor.

T.A. testified that she liked [the Petitioner] other than his touching her. She testified that her mother and [the Petitioner] were good friends.

On cross-examination, T.A. acknowledged that, in July 2011, she testified that [the Petitioner] had not touched her in the same place that a tampon would go. Rather, she had earlier testified that he touched her "[l]ike on top of it," "[l]ike not literally on the outside, but like on the outside of it, yes, but like inside," and "[b]ut on the top, like where something else—like I don't know. Yeah. It wasn't like literally inside, inside, but it practically was. Yes." On cross-examination at trial, she testified that [the Petitioner] touched her inside, where a tampon goes.

T.A. admitted that [the Petitioner] never had threatened her, never had told her that they had a secret, and never had promised her anything for her silence. He did not speak with her about sex or boyfriends, and he never said anything that made her uncomfortable. He never pressed his body against hers, never made her touch his "private part," and never showed his "private part" to her.

On redirect examination, T.A. explained that [the Petitioner] had visited them in the house on Saturn Drive more than four times, but that he would not stay more than three days per visit.

Chris Gilmore testified that he was a school resource officer with the Cheatham County Sheriff's Department but previously had been employed as a police officer with the Clarksville Police Department. On March 18, 2009, he responded to Mother's address on an allegation of child rape. From Mother, he gathered basic information. He did not speak to any children. He notified the appropriate persons within the police department for follow-up.

Detective Ginger Fleischer of the Clarksville City Police Department testified that she was assigned to investigate the matter reported by Mother. Because the alleged criminal conduct had taken place in Nashville, she contacted the appropriate Nashville authorities. Detective Fleischer and Detective Fleming of the Davidson County Police Department determined that a "controlled phone call" between Mother and [the Petitioner] would be helpful to the investigation. She explained to Mother that the phone call would be monitored and recorded. The phone call was scheduled to take place on March 24, 2009, the day after the forensic interview of the children. On that day, Mother made three phone calls to [the Petitioner], and all three phone calls were recorded and transcribed. The recordings were admitted into evidence and played for the jury. A fourth recorded phone call was made by Mother to [the Petitioner] on the next day. This recording also was admitted into evidence and played for the jury. Additionally, the transcripts of all the recorded phone calls were admitted.

Hollye Gallion, a pediatric nurse practitioner with the Our Kids Center in Nashville, testified that she performed medical examinations on J.A. and T.A. on April 21, 2009. In conjunction with performing the exams, she reviewed the medical history reports given by the children to a social worker. J.A. reported that "a guy named Tim" had touched the outside of her butt and the outside of her "tootie" with his hands, explaining that she "pee[d]" out of her "tootie." J.A. reported that the touching had occurred more than once. Asked if she remembered the first time, J.A. reported, "It was in our old house in Nashville; I was around six or seven years old."

Gallion testified that J.A.'s physical examination was "normal." She did not find "any injuries or concerns of infection." She also stated that the results of the physical examination were consistent with the medical history

- 9 -

that J.A. reported. Gallion added, "Touching typically doesn't leave any sort of evidence or injury."

Gallion testified that, in giving her medical history to the social worker, T.A. reported that [the Petitioner] had touched the outside of her "too-too" with his hand, explaining that she "pee[d]" from her "too-too." T.A. reported that the touching had occurred more than once and that she was "around five or six" the first time. On conducting a physical exam, Gallion concluded that T.A.'s genital area and her "bottom" "looked completely healthy and normal." Gallion added that T.A.'s "physical exam was very consistent with what her history was."

Anne Fisher Post, a forensic interviewer employed by the Montgomery County Child Advocacy Center, testified that she conducted forensic interviews of J.A. and T.A. These interviews were recorded and, without any contemporaneous objection from [the Petitioner], the recordings were admitted into evidence but were not played for the jury in open court.

State v. Timothy P. Guilfoy, M2012-00600-CCA-R3-CD, 2013 WL 1965996, *1-8 (Tenn. Crim. App. May 13, 2013). At the close of its case-in-chief, the State delivered an election of offenses which corresponded with details from each victim's testimony. Id. at *8-9.

On direct appeal, this court merged two of the Petitioner's convictions for aggravated sexual battery against J.A. and two of the Petitioner's convictions for rape of a child against T.A. Id. at *18, *21. Additionally, this court concluded that challenges to the testimonies of Hollye Gallion and Anne Fisher Post, as well as the admission of the recorded phone calls and forensic interviews, were waived by trial counsel's failure to contemporaneously object and that the Petitioner was not entitled to plain error relief. Id. at *12-14.

*Post-Conviction Proceedings*

The Petitioner filed a petition for post-conviction relief alleging ineffective assistance of counsel. At the post-conviction hearing, trial counsel testified that he did not object to the introduction of the recorded forensic interviews as substantive evidence at trial and that he did not request that a limiting instruction be given to the jury. Trial counsel recalled that he went through the forensic interviews and redacted any reference to incidents that happened outside of Davidson County or incidents that involved a third victim, A.A. He identified the portions of the interview that needed to be redacted by looking for references to A.A., to "things that 'happened at the new house,'" or to "things

that 'happened where we live now.'" Trial counsel recalled that he redacted statements from T.A. regarding incidents that happened in Montgomery County. However, trial counsel admitted that the redacted version of the video included the following statement:

> Interviewer: Okay. So, you've told me about a time he put his hand in your pants and touched your private part and nothing went inside. And you told me about a couple of times when he touched your private part and his finger went inside.

Trial counsel confirmed that at least two of the three events included in the interviewer's summary occurred in Montgomery County.

Trial counsel explained that he did not object to the admission of the video-recorded forensic interview because he believed that, when a victim was impeached, the victim's prior consistent statements were admissible as to the subject of the victim's credibility. He expected the trial court to give a limiting instruction to the jury and failed to notice that no limiting instruction was given.

Trial counsel also recalled that controlled phone calls between the Petitioner and the victims' mother were introduced into evidence. Trial counsel did not file any pretrial motions to suppress the introduction of the phone calls, but he did redact the phone calls because they contained references to incidents that happened in Montgomery County. In a portion of the recorded phone calls, the Petitioner stated, "[H]ad said it was me?" In the redacted version, a portion of what the victims' mother said to the Petitioner immediately before he made that statement was removed. Trial counsel agreed that, taken out of context, the Petitioner's statement could have been characterized as having a guilty mind. Trial counsel stated that his failure to redact that portion of the recorded phone call must have been an oversight.

Trial counsel also admitted that the unredacted phone calls included a statement from the Petitioner where he admits that he woke up one time to find T.A. on top of him. When he attempted to push her off of him, his fingers went inside her underwear. This incident occurred in Montgomery County. In the redacted version, the location of the incident was taken out, but the details of the incident remained.

Trial counsel explained that his theory of defense during the second trial was to demonstrate "the implausibility of the allegations" against the Petitioner. Trial counsel recalled that, during the first trial, he extensively cross-examined the victims' mother about the particular dates the incidents were alleged to have occurred. Trial counsel used a large poster board to create a diagram of the alleged dates and then, through other witnesses, demonstrated that the Petitioner was not in Nashville on the dates in question.

- 11 -

However, trial counsel did not use the same technique during the second trial. He explained:

> My thinking was, the lack of specificity, with regard to dates, was a weakness in the State's case for the first trial. And in the second trial, obviously, they would fix that, they would be prepared for what I was doing. So, my thinking was, the second trial we would present our case differently, because if we tried the same case twice the State would be able to anticipate everything we did.

Trial counsel also recalled that the State's direct examination of the victims' mother was essentially the same in each trial. Trial counsel agreed that he could have addressed in the second trial the issue of dates in order to demonstrate the implausibility of the allegations against the Petitioner.

Trial counsel also confirmed that he did not object to the respective testimony of Ms. Gallion and Ms. Post. He agreed that their respective testimony could have bolstered the victims' testimony.

On cross-examination, trial counsel stated that he was one of about six attorneys who regularly represented clients charged with child sex abuse. He stated that it was common for there to be no unbiased adult eyewitnesses in such cases. Often, such cases turned on the victim's credibility. Trial counsel recalled that the State's general practice in such cases would be to have the nurse practitioner qualified as an expert witness, but he did not know whether the forensic interviewer was qualified as an expert. He also recalled that he met with the prosecutor about redacting statements from the recorded phone calls, and the prosecutor agreed to "redact everything we wanted redacted."

Kathleen Byers, the Petitioner's sister, testified that she was present at both trials. After the jury was released to deliberate in the second trial, Ms. Byers asked trial counsel if she had time to get lunch before the jury returned. Trial counsel told her that she likely did because the jurors had requested that a TV and viewing equipment be brought into the jury room so they could "watch the video."

The post-conviction court denied relief, noting that trial counsel admitted that his failure to object to improperly admitted evidence was not meant to further a defensive strategy and that "several other instances of alleged deficient performance" were due to oversights on the part of trial counsel. However, the post-conviction court held that, even if the Petitioner's allegations were true, trial counsel's deficiencies did not result in prejudice. This timely appeal followed.

## Analysis

On appeal, the Petitioner contends that trial counsel was ineffective for failing to: (1) properly redact the video of T.A.'s forensic interview; (2) object to the admission of the forensic interviews as substantive evidence; (3) properly redact the recordings of the controlled phone calls; (4) present an alibi defense; (5) object to Ms. Gallion's testimony regarding the results of T.A.'s medical exam; and (6) object to Ms. Post's testimony that victims could not realistically be expected to remember details of events.

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. Jaco v. State, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). As such, we review a trial court's findings of fact under a *de novo* standard with a presumption that those findings are correct unless otherwise proven by a preponderance of the evidence. Id. (citing Tenn. R. App. P. 13(d); Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997)). The trial court's conclusions of law are reviewed "under a purely *de novo* standard, with no presumption of correctness . . . ." Id.

When reviewing the trial court's findings of fact, this court does not reweigh the evidence or "substitute [its] own inferences for those drawn by the trial court." Id. at 456. Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge." Id. (citing Henley, 960 S.W.2d at 579).

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove two factors: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. Strickland, 466 U.S. at 687; Henley, 960 S.W.2d at 580; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689; see also Henley, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. Granderson v. State, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the Strickland analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." Henley, 960 S.W.2d at 579 (citing Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)); see also Goad, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that the counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688); see also Baxter, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. Goad, 938 S.W.2d at 370. Therefore, under the second prong of the Strickland analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (quoting Strickland, 466 U.S. at 694) (internal quotation marks omitted).

*Failure to Properly Redact T.A.'s Forensic Interview*

The Petitioner argues that he was prejudiced by trial counsel's failure to properly redact T.A.'s forensic interview because it violated his right to a unanimous jury verdict. He claims that it allowed the jury to find the Defendant guilty for the counts involving T.A. based on the interviewer's summary of T.A.'s statements during the forensic interview, which included references to incidents alleged to have occurred in Montgomery County.

In the unredacted copy of her forensic interview, T.A. described several incidents where the Petitioner touched her "private part." She described two incidents that happened in Montgomery County, including one incident where the Petitioner's finger "went inside [her] private part." T.A. also described an incident that took place in Davidson County which did not involve penetration. The details of both incidents from Montgomery County were redacted from the forensic interview before the interview was presented to the jury. However, trial counsel failed to redact the interviewer's comment where she said:

> Okay. So you've told me about a time that [the Petitioner] put his hand in your pants and touched your private part and nothing went inside. And you told me about a couple of times when he touched your private part and his finger went inside.

At trial, T.A. gave detailed descriptions of three instances that occurred in Davidson County where the Petitioner's finger went inside her "private part." After

- 14 -

resting its case-in-chief, the State delivered an election of offenses for each count of rape of a child against T.A.  The details of each elected offense corresponded with two of the events T.A. described during her testimony at trial.[3]  At the same time, the State dismissed the single count of aggravated sexual battery against T.A.

Trial courts may admit evidence of other sexual crimes when an indictment charges a number of sexual offenses but does not allege the specific date such offenses occurred.  State v. Rickman, 876 S.W.2d 824, 828 (Tenn. 1994).  However, in such cases, the state is required "to elect the particular offenses for which convictions are sought." State v. Shelton, 851 S.W.2d 134, 137 (Tenn. 1993); State v. Burlison, 501 S.W.2d 801, 803 (Tenn. 1973).  Requiring the state to make an election serves three purposes:

> First, to enable the defendant to prepare for and make his defense to the specific charge; second, to protect him from double jeopardy by individualization of the issue, and third, so that the jury's verdict may not be a matter of choice between offenses, some jurors convicting on one offense and others, another.

Burlison, 501 S.W.2d at 803.  In short, such practice allows the State latitude when prosecuting criminal acts against young children while simultaneously preserving a criminal defendant's right to a unanimous jury verdict.  Rickman, 876 S.W.2d at 828; see also Shelton, 851 S.W.2d at 137 (stating, "A defendant's right to a unanimous jury before conviction requires the trial court to take precautions to ensure that the jury deliberates over the particular charged offense, instead of creating a 'patchwork verdict' based on different offenses in evidence" (citing State v. Brown, 823 S.W.2d 576, 583 (Tenn. Crim. App. 1991)).

In this case, T.A. testified at trial about three different instances where the Petitioner penetrated her "private part" with his finger.  After the close of its case-in-chief, the State delivered an election of offenses to the jury, which contained facts that clearly corresponded to T.A.'s trial testimony.  The Petitioner's right to a unanimous verdict was protected when the State satisfied the election requirement.

Further, the Petitioner has failed to prove that he was prejudiced by trial counsel's failure to redact the forensic interviewer's statement from the video.  As noted above, the State's election of offenses protected the Petitioner's right to a unanimous jury verdict. In the redacted copy of the forensic interview, T.A. described only one incident of

---

[3] On direct appeal, this court merged two of the Petitioner's convictions for rape of a child against T.A. because the State elected the same incident for those two counts.  Timothy P. Guilfoy, 2013 WL 1965996, at *20.  However, this court noted that T.A.'s testimony described three separate instances and that the record failed to reveal why the State did not elect the third incident as the basis for the third count of rape of a child.  Id. at *20 n.8.

- 15 -

misconduct happening in Davidson County, and it did not include penetration. At trial, she described three instances that occurred in Davidson County, all three of which included penetration. Accordingly, we do not believe that, had trial counsel redacted the interviewer's comment, there was a reasonable probability that the outcome of the trial would have been different. See Strickland, 466 U.S. at 694. The Petitioner is not entitled to relief.

*Admission of Forensic Interview Videos as Substantive Evidence*

The Petitioner argues that trial counsel was deficient when he failed to object to the introduction of the videos of the victims' forensic interviews as substantive evidence or request that a limiting instruction be given to the jury. The Petitioner claims that the videos could have only been introduced as prior consistent statements and, consequently, their introduction as substantive evidence was unlawful. The Petitioner contends that he was prejudiced because the admission of the videos as substantive evidence violated his right to a unanimous jury verdict and his protection against double jeopardy. Specifically, the Petitioner argues that the jury's verdicts were based on the forensic interviewer's summary comment in T.A.'s interview as opposed to the evidence presented at trial.

As a preliminary matter, we note that the Petitioner has not identified any prejudice he suffered as a result of the admission of J.A.'s forensic interview. As such, we will limit our analysis to the admission of T.A.'s forensic interview, which included the forensic interviewer's summary statement of events that happened in both Davidson and Montgomery Counties. See Carpenter v. State, 126 S.W.3d 879, 886 (Tenn. 2004) ("Failure to establish either prong [of the Strickland test] provides a sufficient basis to deny relief.")

At trial, T.A. was asked to identify a copy of her forensic interview. Then, during the testimony of Ms. Post, the forensic interviewer, the State introduced a copy of T.A.'s forensic interview into evidence without any argument as to its admissibility or explanation as to why it was admitted. Trial counsel made no objection, and the trial court provided no contemporaneous limiting instruction. During the jury charge, the trial court instructed the jury that prior inconsistent statements could be used only to determine a witness's credibility. However, the trial court did not provide a similar instruction for prior consistent statements.

On direct appeal, this court stated, "Although the record clearly demonstrates that the trial court erred in admitting the recordings of the interviews into evidence, the record does *not* demonstrate that the jury ever watched the interviews." Timothy P. Guilfoy, 2013 WL 1965996, at *14 (emphasis in original). As such, this court concluded that the

Petitioner had failed to satisfy the first requirement of plain error review—that the record clearly established what happened at trial. Id. at *14.[4]

It is not clear from the record why T.A.'s forensic interview was introduced into evidence. Nevertheless, this court has previously determined that the trial court erred in admitting the recording. Id. While the State argues in this appeal that the interview was properly admitted as a prior consistent statement, the State concedes that the trial court did not issue a proper limiting instruction. See State v. Braggs, 604 S.W.2d 883, 885 (Tenn. Crim. App. 1980) (when prior consistent statements are admitted to rehabilitate a witness, the trial court should instruct the jury that the statement cannot be considered for the truth of the matter asserted).

However, despite trial counsel's failure to object to the introduction of the video or request a limiting instruction, the Petitioner has failed to demonstrate that he was prejudiced by its introduction as substantive evidence. As discussed above, the forensic interviewer's summary statement did not violate the Petitioner's right to a unanimous jury verdict because the State provided an election of offenses. The details of each elected offense corresponded to incidents both J.A. and T.A. described in their trial testimony. The Petitioner has failed to prove that there was a reasonable probability that the outcome of the trial would have been different had the forensic interview not been introduced as substantive evidence. Accordingly, the Petitioner is not entitled to relief.

### Failure to Properly Redact Recordings of Controlled Phone Calls

The Petitioner claims that trial counsel was ineffective for failing to properly redact two statements from the controlled phone calls—one where the Petitioner described an incident which occurred in Montgomery County and one where the Petitioner asked the victims' mother, "Had said it was me?" We will address each in turn.

### a. Incident in Montgomery County

The Petitioner claims trial counsel was ineffective for failing to redact a portion of the controlled phone calls where the Petitioner described an incident that happened in Montgomery County when he woke up to find T.A. asleep on top of him. Trial counsel filed a pretrial motion to have this portion of the recorded telephone call redacted, which the trial court granted. However, instead of redacting the entire incident, trial counsel only redacted some details where the Petitioner stated he may have placed his hand under

---

[4] The Petitioner attempted to correct this gap in the record through the post-conviction testimony of Ms. Byers that trial counsel told her she had time to get lunch because the jury had requested equipment to view the video.

T.A.'s underwear when he pushed her off him. Trial counsel also redacted the Petitioner's statement establishing that this incident happened in Montgomery County. Consequently, the following redacted version of the phone call was submitted at trial:

[Mother]: Look, I asked you to call me back to call me and be truthful.

[The Petitioner]: I know, I'm trying to be truthful.

[Mother]: (Inaudible)

[The Petitioner]: Okay, okay, okay, okay, this is the one thing, the only f***ing thing, the only time, and what I'm scared about, I'm scared that you're going to take something one time and go to sleep tonight and wake up tomorrow and say, oh well, if it's one time, it must have been every time, because I—I swear, I'm not lying to you about the fact that I don't remember doing anything except one time, that's it, and—and the reason I didn't want to bring it up is because it sounds like I'm blaming someone else.

[Mother]: Right.

[The Petitioner]: But it happened.

[Mother]: If it was once, go ahead, go ahead.

[The Petitioner]: It happened, and I'm not going to say it's not my fault, it's just, I woke up—I woke up and I was—I was in my—I was in my shorts, whatever, I just sleep in my shorts all the time, and [T.A.] was on top of me.

[Mother]: Okay.

[The Petitioner]: And I kind of pushed her off, not violently, kind of like understanding, pushed her off,

[The Petitioner]: And, and, and I pushed her off as soon as I figured out what was going on, I did. I'm not—I mean, I was just f***ing terrified. And you know what, I did go back to sleep, I went back to sleep so I wouldn't have to f***ing deal with it, and I—the next morning I was going to say something to you, but you weren't there and I would have had to call you and—

[The Petitioner]: I tried to, I tried—I tried to talk to [T.A.] about it.

- 18 -

Trial counsel generally addressed the controlled phone calls during closing argument, contending that they were designed to elicit an admission from the Petitioner but that the Petitioner did not admit to any sexual contact. During rebuttal argument, the State argued, "[The Petitioner] had the time. He had the opportunity. He had the place. That corroborates [the victim's] version of what happened. [The Petitioner] himself provides a great deal of corroboration." Later, the State referenced the Petitioner's statement that "there was this one time that [T.A.] was on me" in order to illustrate the Petitioner was attempting to shift the blame to someone else.

The Petitioner argues that trial counsel was deficient for failing to redact the entire exchange about the Petitioner waking up with T.A. on top of him. Further, the Petitioner contends that he was prejudiced "in the same way the Defendant was prejudiced in State v. Danny Ray Smith." However, we find no support in the case for the Petitioner's argument in that case.

In State v. Danny Ray Smith, No. E2012-02587-CCA-R3-CD, 2014 WL 3940134 (Tenn. Crim. App. Aug. 13, 2014), no. perm. app. filed, the defendant proceeded to trial on one count of rape of a child. Danny Ray Smith, 2014 WL 3940134, at *10. The trial court allowed the State to admit evidence of other sexual offenses under the "special rule admitting evidence of other sexual crimes when an indictment charges a number of sexual offenses, but alleges no specific date upon which they occurred." Id. at *10, *12 (citing Rickman, 876 S.W.2d at 828). Consequently, the victim's testimony detailed instances where the defendant penetrated her vagina and her "bottom" with his finger, penetrated her vagina with "his mouth," and one instance where the defendant placed his "private part" on the victim's "private part" and "stuff" came out of the defendant's private part and "went onto [the victim's] private part." Id. at *2. The State also introduced the defendant's statement wherein he admitted to several instances of sexual abuse—one where he "rubbed" the victim's vagina while she "rubbed" his penis, one where he penetrated the victim's vagina with the tip of his little finger, one where he performed oral sex on the victim and penetrated her vagina with his tongue, and one where he ejaculated onto the victim's abdomen. Id. at *3.

This court held that it was reversible error to admit evidence of other sexual acts because the State knew in advance the offense for which it sought a conviction. Id. at *13. Because evidence of other sexual acts was inadmissible under Rickman, the defendant's statement to investigators should have been redacted to exclude acts other than the act for which the State sought a conviction—his penetrating the victim's vagina with his pinky finger. Id.

In this case, unlike the defendant in Danny Ray Smith, the Petitioner does not contest the State's admission of other instances of sexual misconduct under Rickman. He simply contests the introduction of any reference to instances that occurred in

- 19 -

Montgomery County. We note that trial counsel failed to redact a portion of the incident that happened in Montgomery County from the phone calls. However, we do not believe trial counsel's failure resulted in prejudice. The portion of the recorded phone call that the Petitioner claims should have been redacted does not contain any reference to sexually illicit conduct. Instead, the Petitioner simply states that he woke up one night to find T.A. on top of him and he pushed her off gently. Additionally, T.A. did not testify to a similar incident at trial. Therefore, the recorded phone call was not used to corroborate her testimony. As to the State's argument during closing that "[the Petitioner] himself provides a great deal of corroboration," it is clear from the transcript that the State was not referencing the incident described during the phone call. Instead, the State was highlighting the fact that the Petitioner did not deny that he had time and opportunity to commit the acts.

We note that the State did reference the incident during its closing argument to illustrate that the Petitioner was trying to shift the blame to someone else. However, we do not believe that the reference makes the redacted statement prejudicial, especially when it is considered in the greater context of the recorded phone calls. As we noted on direct appeal, the recorded phone calls "are replete with the [Petitioner's] repeated denials that he remembered ever touching the victims inappropriately." Timothy P. Guilfoy, 2013 WL 1965996, at *14. Both the State and the Petitioner made the same observation during closing arguments. Accordingly, the Petitioner has failed to prove that there was a reasonable probability that the outcome of the trial would have been different had trial counsel redacted the entire description of the incident from Montgomery County. The Petitioner is not entitled to relief.

### b. "Had said it was me?" Statement

The Petitioner claims counsel was ineffective for failing to properly redact the following portion of the controlled phone call:[5]

[Mother]: Well, I needed to talk to you about something kind of serious.

[The Petitioner]: Yeah?

[Mother]: Yeah. I um—I got a phone call today from [J.A.'s] guidance counselor?

[The Petitioner]: Oh yeah?

---

[5] Portions in italics were redacted from the phone calls before the recordings were presented to the jury.

[Mother]:  And she kind of insinuated to her that—that somebody was touching her in the wrong ways.

[The Petitioner]:  Really?

[Mother]: Yeah.

[The Petitioner]:  Oh man.

[Mother]:  And uh, I mean obviously I went and picked them up.

[The Petitioner]:  Sure, sure . . . man, that's, that's, man, that's . . . f***ing puke.

[Mother]:  Yeah. Well uh . . . they didn't really [say] anything about who it was, and I'm trying to figure out y'know . . .

[The Petitioner]:  Yeah.  I, I mean anybody . . .

*[Mother]:  Well, yeah, and well when I talked to [T.A.] and [A.A.] about it cause apparently they said it was her sisters too, they were, they were um . . . [A.A.] said it was you.*

[The Petitioner]:  Had said it was me?

The Petitioner argues that this "confusing edit" allowed the State to argue in its closing that the Petition had a guilty mind.  To support his argument, the Petitioner points to a section of the State's closing where the prosecutor argued:

I am not going to go through [the phone calls] line by line, but I just want you to think about the way he answered the phone.  The fact that [Mother] said to him, pretty much right off, "The girls are saying someone touched them."  [] Does he say who?  No, because he knows.

First, we note that trial counsel testified at the post-conviction hearing that he redacted anything in the phone calls which referenced A.A., a third, unindicted victim. The portion that was redacted clearly shows that A.A. identified the Petitioner as the suspect.  As such, we cannot say that trial counsel was deficient in redacting this portion of the recorded phone calls.

Additionally, we are unable to determine that the Petitioner was prejudiced by trial counsel's failure to redact the comment, "Had said it was me?"  It appears that the Petitioner was confirming that someone had accused him of the alleged conduct, a fact

- 21 -

the jury would clearly know since the victims' mother made the police controlled calls to the Petitioner and the Petitioner is on trial for the offenses. Moreover, the prosecutor's comment is not referring to this lone statement or question—it is referring to the Petitioner's failure to ask the mother who the girls said touched them. Further, as noted above, the remainder of the phone calls is "replete with the [Petitioner's] repeated denials that he remembered ever touching the victims inappropriately." See Timothy P. Guilfoy, 2013 WL 1965996, at *14. Therefore, the Petitioner has failed to show that he was prejudiced by the way this particular portion of the controlled phone calls was redacted. The Petitioner is not entitled to relief.

*Failure to Present an Alibi Defense*

The Petitioner argues that trial counsel was ineffective because he failed to present an alibi defense similar to the defense that was presented in the Petitioner's first trial. Through the victims' mother and other witnesses during the first trial, trial counsel was able to demonstrate that the Petitioner was not at the victims' home on the dates their mother alleged the abuse occurred. However, trial counsel did not employ a similar technique during the second trial. During the second trial, the Petitioner's theory of defense was to show the implausibility of the victims' allegations. At the post-conviction hearing, trial counsel explained that he chose not to present the same defense because he anticipated that the State would have solidified the dates on which the abuse was alleged to have occurred. Additionally, trial counsel stated that he changed his defense strategy because "if we tried the same case twice the State would be able to anticipate everything we did." We will not second-guess a reasoned, yet ultimately unsuccessful, trial strategy. See Granderson, 197 S.W.3d at 790. Accordingly, the Petitioner is not entitled to relief.

*Failure to Object to Ms. Gallion's Testimony*

The Petitioner contends that trial counsel should have objected when Ms. Gallion testified that T.A.'s medical exam, which showed no injury, was consistent with both penetration and no penetration. Specifically, the Petitioner claims trial counsel should have objected to the following testimony:

[The State]: Let me ask you this, put your expert hat on and ask you hypothetically: If [T.A.] [had] said to [the intake interviewer] that she was touched by an adult male's hand on the inside of her genitals, would there have been anything inconsistent about the medical exam, with that history given?

- 22 -

[Ms. Gallion]: No. Again, the majority of children we see actually describe some type of penetration. That's one of the reasons that we often see children. Penetration with a hand, a finger, penetration with a penis. Typically those children also have completely normal exams.

The Petitioner contends that Ms. Gallion's comment did not "substantially assist the trier of fact to understand the evidence or to determine a fact at issue. . . ." Tenn. R. Evid. 702. Additionally, the Petitioner asserts that Ms. Gallion's comment was offered simply to bolster T.A.'s testimony and that its "extremely prejudicial" nature outweighed its probative value.

At trial, both parties stipulated to Ms. Gallion's qualification as an expert. As an expert witness, she was allowed to offer her opinion. Tenn. R. Evid. 702. When an expert's opinion is otherwise admissible, it "is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Tenn. R. Evid. 704.

Whether the Petitioner penetrated T.A. with his finger was a question of fact for the jury to resolve. Ms. Gallion's testimony about the results of T.A.'s medical examination and whether those results were or were not consistent with penetration substantially assisted the jury in evaluating T.A.'s medical report, which showed no injury to T.A. Additionally, we do not believe that Ms. Gallion's testimony was so prejudicial as to outweigh its probative value. Accordingly, trial counsel was not deficient for failing to object to this portion of Ms. Gallion's testimony. The Petitioner is not entitled to relief.

*Failure to Object to Ms. Post's Testimony*

The Petitioner argues that trial counsel should have objected to the following testimony:

[The State]: What is your experience in the area of interviewing children who have perhaps been subjected to a number of instances of abuse over a fairly lengthy period of time, beginning when they are very young? Is it realistic to expect that you'll get every detail from every incident?

[Ms. Post]: Certainly not. It depends, too, on the age of the child. Very little children, we expect to capture only very limited information about any event that happens in their lives. And there are lots of things that can disrupt a kid's memory of an abuse event. Trauma can disrupt memory, for example.

The Petitioner contends that Ms. Post's testimony constitutes improper expert testimony because Ms. Post was not offered as an expert witness. Additionally, the Petitioner argues that the State offered this evidence to support the victims' credibility by explaining why they could not provide any details of when the abuse occurred.

The Tennessee Supreme Court addressed this issue in a similar case, State v. Bolin, 922 S.W.2d 870 (Tenn. 1996). In that case, the social worker who performed the forensic interview testified that children who had been abused over a long period of time often had trouble remembering the details of when and how each event took place. Id. at 872-73. Our supreme court held that the social worker's testimony constituted expert proof and that its admission through a non-expert witness was error. Id. at 874. However, the court also found that any error was harmless. Id. Specifically, the court stated:

> The testimony essentially consists of an explanation of a narrow issue—why K.N. could not assign reasonably specific time or dates to any of the alleged events of sexual abuse. Therefore, the testimony does not, unlike the testimony in *Ballard*, purport to completely vouch for the overall credibility of the victim, and thus it cannot be said to have "explained away" the inconsistencies and recantations—the heart of the defense theory. Hence, the damaging effect of the testimony is minimal.[6]

Id.

Similarly, the admission of Ms. Post's testimony was error. She did not testify as an expert witness but offered testimony that was "specialized knowledge" she gathered from her experience as a forensic interviewer. See id. Moreover, we note there is nothing in the post-conviction record to indicate that trial counsel did not object for strategic reasons. Even if this were deficient performance on the part of trial counsel, the Petitioner has failed to establish any resulting prejudice. Like the social worker in Bolin, Ms. Post's testimony addressed the narrow issue of why the victims could not provide details of when the events occurred. It did not address inconsistencies in the victims' descriptions of what occurred during the abuse or address the "implausibility" of their allegations, the core of the Petitioner's defense theory during the second trial. Admittedly, there was no conclusive medical evidence that either victim had been sexually abused, but the medical evidence did not rule out the possibility of abuse.

---

[6] In State v. Ballard, 855 S.W.2d 557 (Tenn. 1993), the expert witness testified that the victims exhibited "symptom constellations" consistent with being sexually abused. Ballard, 855 S.W.2d at 561. The supreme court concluded that because the behavior profile was consistent with a number of psychological stressors, including sexual abuse, the list of symptoms was too generic to be probative. Id. at 562. Therefore, the admission of expert testimony was reversible error. Id. at 563.

Further, the victims told several people about the abuse—their grandfather, their mother, Ms. Post, and Ms. Gallion—over a period of several weeks. Also, they testified about the abuse during the first trial. Trial counsel specifically addressed the inconsistencies between their testimonies at both trials during cross-examination. Accordingly, the Petitioner has failed to demonstrate that he was prejudiced by trial counsel's failure to object to Ms. Post's testimony and is not entitled to relief.

### Conclusion

The judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE